# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 95-CA-00071-SCT

*DELSIE BURTON, ADMINISTRATRIX OF THE
ESTATE OF EVIE BURTON, DECEASED*

*v.*

*CHOCTAW COUNTY, MISSISSIPPI; CHOCTAW
COUNTY HOSPITAL d/b/a CHOCTAW COUNTY
NURSING HOME; HOMER MACK MARTIN,
DIRECTOR OF SAID NURSING HOME IN HIS
REPRESENTATIVE CAPACITY; THE COLLECTIVE
BOARD OF TRUSTEES OF THE CHOCTAW COUNTY
HOSPITAL AND THE INDIVIDUAL MEMBERS
THEREOF: R. T. McKNIGHT, JIM CRESAP, SAMMY
WHITMIRE, DON THREADGILL, SAMUEL V.
KENNEDY, FRANK RANDALL, AND SHARON
CASTLE, IN THEIR REPRESENTATIVE
CAPACITIES; AND ROCHELLE MOORE*

| | |
|---|---|
| DATE OF JUDGMENT: | 12/31/94 |
| TRIAL JUDGE: | HON. HENRY ROSS |
| COURT FROM WHICH APPEALED: | CHOCTAW COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | RABUN JONES |
| ATTORNEYS FOR APPELLEE: | J. LAWSON HESTER |
| | STEVE WRIGHT |
| | HUGH HATHORN |
| | GEORGE MITCHELL |
| NATURE OF THE CASE: | CIVIL - PERSONAL INJURY |
| DISPOSITION: | REVERSED AND REMANDED - 8/7/97 |
| MOTION FOR REHEARING FILED: | 8/21/97 |
| MANDATE ISSUED: | 4/29/99 |

**BEFORE SULLIVAN, P.J., McRAE AND ROBERTS, JJ.**

**McRAE, JUSTICE, FOR THE COURT:**

¶1. In this appeal, we are asked to determine whether the circuit court committed reversible error in granting summary judgment on the plaintiff's state law claims on the grounds of sovereign immunity. Because we find that genuine issues of material fact remained as to whether professional services were involved in this case, and because the exclusionary clause under review in this case was ambiguous, we answer in the affirmative. Accordingly, we reverse and remand for trial on the merits.

## I.

¶2. Delsie Burton filed her initial complaint in the Circuit Court of Winston County, Mississippi for the wrongful death of her mother, Evie Burton, who died on September 1, 1993. According to the medical examiner's report, Evie died as a result of burns she sustained on August 29, 1993, while she was being bathed by Rochelle Moore.

¶3. In 1993, Evie Burton was a resident of the Choctaw County Nursing Home located in Ackerman, Mississippi. On August 29, 1993, as part of her employment as a nurse's aide with the Choctaw County Nursing Home, Rochelle Moore ran bath-water in a whirlpool to give Evie Burton a bath. Moore tested the temperature of the water with her bare arm and hand and found it satisfactory. Burton also tested the water by putting her foot in and demonstrated that the water was okay. Burton was placed in the lift chair, strapped in, and lifted over the water.

¶4. Maggie Baldwin, another nursing home employee, added the soap to the water, and Burton was placed inside the tub. After Moore bathed Burton, Moore asked Melissa Reed and Mary Baker to help get Burton out of the tub. When they got her out, Reed noticed a small spot on Burton's left hip. Although Burton had no burns on her body prior to being placed in the water, redness of her extremities was noted over the next thirty minutes with blisters beginning and continuing to form.

¶5. Early on, doctors felt that the burns were of first and second degree over approximately fifty percent of Burton's body from her mid-back down over the buttocks, perineal area and lower extremities. Later, however, it was determined that the burns were second and third degree and covered over sixty percent of Burton's body. Evie Burton was transferred to Hospital, where she died on September 1, 1993. The medical examiner determined that Burton's burns produced a classic donut patter injury commonly seen in immersion burns of children when placed in water, inducing a thermal burn pattern. The examiner also concluded that these burns precipitated Ms. Burton's death.

¶6. While Burton was a resident of the nursing home and during her brief confinement in the Choctaw County Hospital following her burns, she was under the care of Morris Parsons, M.D. Dr. Parsons's orders pertaining to Ms. Burton indicated that she "may have a whirlpool bath, tub bath, or shower two to three times per week." According to him, "this bathing was not classified as treatment, but instead was for hygienic purposes." As noted by Parsons, Burton was experiencing incontinence during this time, and the bathing was partly to eliminate the body odor problem associated with that. In contrast to assertions made by Parsons, Moore testified in an affidavit that she had been giving nursing treatment to Evie Burton while Burton was living at the Choctaw County Nursing Home.

¶7. At the time of the events complained of by the appellant, Choctaw County, Mississippi was a subdivision of the State of Mississippi. At the time of the occurrence, Choctaw County was also a member of the Mississippi Public Entity Property and Liability Pool. This Pool is a self-insurance fund made of contributions of public funds by approximately twenty-six participating Mississippi

governmental entities.

¶8. Based on an exclusionary clause within the contract between the Pool and Choctaw County, the Administrator of the Pool notified Choctaw County that no coverage existed under the Pool's provisions and that the Pool would not afford Choctaw County a defense or coverage to the appellant's claims. The County then filed its motion to dismiss/for summary judgment. Its theory was that sovereign immunity protected it from suits of such a nature as brought by Delsie Burton, because the acts of Rochelle Moore while she was a county employee were excluded under the coverage of the Pool contract.

## II.

¶9. As a court of appeals, this Court conducts a de novo review of decisions by lower courts to grant summary judgment. *Westbrook v. City of Jackson*, 665 So. 2d 833, 836 (Miss. 1995). In conducting a de novo review, this Court analyzes all affidavits, admissions in pleadings, interrogatory answers, depositions and other matters of record, and considers all such evidence in the light most favorable to the party against whom the motion for summary judgment was made. *Short v. Columbus Rubber and Gasket Co.*, 535 So. 2d 61, 63 (Miss. 1988). If, in this view, the moving party is entitled to judgment as a matter of law, summary judgment should forthwith be entered in his favor. *Westbrook*, 665 So. 2d at 836. Otherwise, the motion should be denied.

¶10. "All motions for summary judgment should be viewed with great skepticism and if the trial court is to err, it is better to err on the side of denying the motion." *Daniels v. GNB, Inc.*, 629 So. 2d 595, 599 (Miss. 1993). A motion for summary judgment should be overruled unless the trial court finds, beyond any reasonable doubt, that the plaintiff would be unable to prove any facts to support his claim. *Id.* In order for there to be genuine issues of material fact, the affidavits and other evidence must be sworn, made upon personal knowledge, and show that the party providing the factual evidence is competent to testify. *Magee v. Transcontinental Gas Pipe Line Corp.*, 551 So. 2d 182, 186 (Miss. 1989).

¶11. The party moving for summary judgment bears the burden of persuading the trial court that no genuine issue of material fact exists, and that they are, based on the existing facts, entitled to judgment as a matter of law. *Skelton v. Twin County Rural Elec. Ass'n*, 611 So. 2d 931, 935 (Miss. 1992). The burden of showing this is one of production and persuasion, not of proof. *Ales v. Ales*, 650 So. 2d 482, 484 (Miss. 1995). To prevent summary judgment, the non-moving party must establish a genuine issue of material fact by means allowable under M.R.C.P. 56(c). *Id.* An issue of fact may be present where there is more than one reasonable interpretation that may be given undisputed testimony, where materially differing but nevertheless reasonable inferences may be drawn from the uncontradicted evidentiary facts, or when the purported establishment of the facts has been sufficiently incomplete or inadequate that the trial judge cannot say with reasonable confidence that the full facts of the matter have been disclosed. *American Legion Ladnier Post Number 42 v. Ocean Springs*, 562 So. 2d 103, 106 (Miss. 1990); *Dennis v. Searle*, 457 So. 2d 941, 944 (Miss. 1984).

### Genuine Issue of Material Fact

¶12. The trial court erred in granting summary judgment because there remained at least one issue of

material fact, based on the summary judgment evidence. Rochelle Moore swore out an affidavit in which she stated that she "assisted registered nurses in rendering nursing treatment to the occupants of the Choctaw County Nursing Home, including Ms. Evie Burton." She repeated in this statement that she provided "treatment" to Evie Burton, including "nursing care and treatment" and "whirlpool bath treatment" on August 29, 1993.

¶13. In contrast, Delsie Burton submitted, in opposition to Choctaw County's motion for summary judgment, an affidavit from Dr. Morris Parsons. Parsons was the attending physician for Evie Burton while she was a resident of the Choctaw County Nursing Home, including the point at which she died. He testified that he directed nursing home staff to give Burton a whirlpool bath, tub bath or shower two to three times per week. He also testified that "[t]his bathing was not classified as treatment, but instead was for hygienic purposes."

¶14. In this case, Burton was admitted to a nursing home and was given a bath by a nurse's aide, who, although certified by the State of Mississippi, is not a professional in the ordinary sense of the word. Further, the bath given was not a part of any treatment, even though the physician recommended that Burton receive periodic baths. Moore's affidavit asserts, rather presumptively, that she was engaged in nursing services. However, the affidavit of Dr. Parsons directly contradicts Moore, in that he asserts that the baths given to Burton were not part of any treatment. They were given partly to keep her clean, due to her incontinence. This dispute in the proof means that an issue of fact exists as to whether nursing treatment was given to Ms. Burton.

¶15. These contradictory statements create a clear factual issue as to whether Burton's bath on August 29, 1993, constituted "nursing treatment." The evidentiary facts presented by Rochelle Moore are readily controverted by the statement of Dr. Parsons. As Dr. Parsons's statement supports the appellant's claim, the trial court erred in saying that, beyond a reasonable doubt, Delsie Burton would not be able to support her claim against Choctaw County and the other defendants. Whether the bath given by Moore constituted "nursing treatment" under the Pool contract between the Pool and Choctaw County is a factual dispute that must be resolved by a jury. On this basis alone, the summary judgment should be reversed and remanded to the lower court.

## Contractual Interpretation

¶16. The trial court also erred in ruling that the term "nursing treatment" was unambiguous. By granting summary judgment to all defendants because it determined that Moore's actions on August 29,1993 were within the definition of "nursing treatment," the trial court necessarily concluded that this term of the insurance contract was clear and unambiguous. However, as the following discussion will show, "nursing treatment" as it is used within this contract is so ambiguous as to preclude an award of summary judgment for the appellees.

¶17. The problematic clause in this case is an exclusionary provision found in a Mississippi Public Entity Property and Liability Pool contract between the Pool and Choctaw County, Mississippi, which reads as follows:

SECTION II - GENERAL LIABILITY (ed. 6/92)

E. Exclusions Applicable to Comprehensive General Liability.

This coverage does not apply to any of the following:

18. Hospital and Health Clinic Professional Liability.

To Personal Injury to any person arising out of the rendering of or failure to render any of the following professional services:

a. Medical, surgical, dental or *nursing treatment* to such person or the person inflicting the injury including the furnishing of food or beverages in connection therewith;

(emphasis added). The term "nursing treatment" is not defined anywhere within the contract.

¶18. The lower court based its decision to grant summary judgment on the policy's scope. The court below found that the Mississippi Public Entity Property Pool provided the County general liability insurance coverage at the time of Evie Burton's injury and subsequent death. However, the trial court also determined that the Pool afforded the county no coverage, and then determined that sovereign immunity attached to the county and all other defendants in the case. The court's decision was grounded in the definitions of "nurse" and "treatment" found in ***Baillere's Encyclopedic Dictionary of Nursing and Health Care***, to wit:

. . .a definition of the word nurse is 'to provide services that are essential to or helpful in the promotion maintenance and restoration of health and well-being.' ***Id.*** at 648. Treatment is defined in that publication as 'management and care of a patient or the combating of disease or disorder.' ***Id.*** at 948.

¶19. The lower court also found that Moore, as a nurse's aide, attained a degree of knowledge and experience that the ordinary layman would not have possessed, including training from a certified nurse's aid program approved by the state of Mississippi. Also, Moore was supervised by a registered nurse on the day of the incident. Finally, the court felt that Moore used "specialized knowledge" when she made the decision regarding the proper water temperature, and the nurse who supervised Moore's actions had the same "specialized knowledge." The trial court noted:

This type of specialized knowledge by a nurse, and the decision emanating therefrom, were deemed to fall within the purview of a professional service in ***Bell v. West Harrison Cty. Dist.***, 523 So.2d 1031 (Miss. 1988), a case cited by the plaintiff.

¶20. The trial court necessarily found the exclusionary clause to be unambiguous, in order to render its summary judgment. However, its determination that the clause was unambiguous makes the summary judgment erroneous. Although the trial court took pains to define only "nurse" and "treatment," it also used ***Bell*** to analogize that Rochelle Moore's actions fell within the ambit of professional services. Unfortunately, the trial court did not follow our well-established rules for summary judgment, because it resolved an ambiguity in the contractual terms in favor of the party moving for summary judgment, rather than the non-movant. By doing so, the trial court erred. *See* ***Short v. Columbus Rubber and Gasket Co.***, 535 So.2d 61 (Miss. 1988).

¶21. This Court has made one attempt to define "professional services" in relation to liability insurance policies:

> Although this Court has never considered the scope of "professional services" as they pertain to a liability insurance policy, other jurisdictions, in construing such clauses have stated that a "professional service" involves the application of special skill, knowledge and education arising out of a vocation, calling, occupation or employment. *Marx v. Hartford Accident & Indemnity Company*, 183 Neb. 12, 157 N.W.2d 870 (1968); *Maryland Casualty Co. v Crazy Water Co.*, 160 S.W.2d 102, 104 (Tex. Civ. App. 1942); *Robertson v. Maher*, 177 So.2d 412, 417 (La. App. 1965).

*Shelton v. American Ins. Co.*, 507 So. 2d 894, 896 (Miss. 1987). We noted in *Shelton* that the title, definitions, and clauses within the policy at issue dealt specifically with the insured's dealings and negotiations as a life underwriter. *Id.* We refused to extend coverage to the insured's activities with prospective employees because the language of the policy only covered "professional" acts or services. *Id.*

¶22. "The mere fact that the parties disagree about the meaning of a provision of a contract does not make the contract ambiguous as a matter of law." *Cherry v. Anthony, Gibbs, Sage*, 501 So.2d 416, 419 (Miss. 1987). Since this Court "must effect 'a determination of the meaning of the language used, not the ascertainment of some possible but unexpressed intent of the parties,'" *Id.*, we must look to prior case law to help determine the meaning of the terms of the contract.

¶23. The *Bell* case, relied upon by the trial court, is quite distinguishable in the context of the instant case. While this Court determined in *Bell* that a nurse's decision whether or not to raise bed rails was a professional, medical decision, it also dealt with a specific statute which referred to professional, licensed nurses. *Bell*, 523 So.2d at 1032. Here, the nurse's aide is not necessarily a "professional" worker; therefore, the *Bell* reasoning is not directly applicable. Apart from *Bell*, we are without helpful precedent. Therefore, a review of how this issue has been resolved by other jurisdictions is appropriate.

¶24. In *Shelton*, this Court has already cited with approval the decision of the Nebraska Supreme Court in *Marx v. Hartford Accident and Indemnity Co.*, 157 N.W.2d 870 (Neb. 1968). The *Marx* court held that in regards to professional services, "[s]omething more than an act flowing from mere employment or vocation is essential. The act or service must be such as exacts the use or application of some special learning or attainments of some kind." *Id.* at 871. It reasoned that the term "professional," within the context of the policy provision in question, meant "something more than mere proficiency in the performance of the task and implies intellectual skill as contrasted with that used in an occupation for production or sale of commodities." *Id.* A "professional" act or service is one arising out of a vocation, calling, occupation, or employment involving specialized knowledge, labor, or skill, and the labor or skill involved is predominantly mental or intellectual, rather than physical or manual. *Id.* at 871-72.

¶25. In other cases holding that an exclusionary clause was inapplicable, there have been findings that no professional services were involved. For example, in *Keepes v. Doctors Convalescent Center, Inc.*, 231 N.E.2d. 274 (Ill. App. Ct. 1967), the plaintiff was an eighteen-month-old mentally retarded child who was being kept by the Doctors Convalescent Center. The child was being bathed by a "nurses aide" who left him unattended for a few minutes. *Id.* at 275. The child had somehow gotten against a hot radiator where he suffered burns. *Id.* The Illinois appellate court held that the

attendant's negligence in leaving the child unattended did not come within the malpractice and professional services exclusion, which said that the policy at issue did not apply to injury, sickness, disease, death or destruction due to the rendering or failure to render medical, surgical, dental, x-ray or nursing service or treatment, or the furnishing of food or beverages in connection therewith. *Id.* The Illinois court pointed out that the nurse's aide was not actually a nurse, had received no medical or nursing training, and did not perform any nursing services. *Id.* at 276. In *Keepes*, however, the attendant's duties were restricted to cleaning rooms, changing bedding and helping to feed and bathe the children. The court also noted that nothing was being done with the infant that would not have been done at home. *Id.*

¶26. The Virginia Supreme Court was faced with a similar question in *Granite State Ins. Co. v. Bottoms*, 415 S.E.2d 131 (Va. 1992). The original plaintiff was an 89-year-old resident of the Zion Baptist Home for the Elderly and was unable to bathe herself, unable to care for her "toileting needs" unassisted, unable to groom herself, and unable to dress unassisted. *Id.* at 132. Contending that the language of the exclusionary clause was plain and unambiguous, the insurer for the Home argued that the resident was injured, within the terms of the exclusion, when the Home's employee was "rendering service or treatment conducive to health or of a professional nature." The insurer argued that it was obvious that bathing an elderly and incompetent resident was a professional service conducive to her health. However, the Virginia Supreme Court disagreed, concluding that the "conducive to health" language of the relevant exclusionary clause was ambiguous. *Id.* at 134. The court found that manifestly, the language was so broad that it may be construed in many ways. *Id.*

¶27. In the instant case, the appellant and appellee present two sharply contrasting views as to how to treat the terms in the exclusionary clause. The appellant points to *Shapiro v. Aetna Ins. Co.*, 208 N.Y.S.2d 83, 84 (1960):

> An ambiguity is present as to what is meant by 'professional nursing' and this prevents summary judgment. When the language employed is not free from ambiguity, or when it is equivocal, and its interpretation depends upon the sense in which the words were used, in view of the subject to which they relate, the relationship of the parties, and the surrounding circumstances properly applicable to it, the intent of the parties becomes a matter of inquiry, and the interpretation of the language used by them is a mixed question of law and fact.

The appellees point to, *inter alia*, *Ford Hospital v. Fidelity and Casualty Co.*, 183 N.W. 656 (Neb. 1921). That court held that the term "hospital treatment" applied to and included the bathing of a newborn infant who was burned when his hand touched a hot appliance. *Id.* at 658.

¶28. Suffice it to say that jurisdictions are split across the country regarding these issues. *Compare Duke Univ. v. St. Paul Fire and Marine Ins. Co.*, 386 S.E.2d 762 (N.C. Ct. App. 1990)(term "professional services" within exclusionary clause encompasses only those services for which professional training is a prerequisite--failure to lock casters on dialysis chair not within exclusion); *Robertson v. Maher*, 177 So. 2d 412 (La. Ct. App. 1965)(counting of sponges was not act requiring exercise of particular skill or discretion acquired or developed by special training); *and New Amsterdam Casualty Co. v. Knowles, Fla*, 95 So. 2d 413 (Fla. 1957)(despite condition of bed rails being due to nursing care, insurance company's knowledge that it was insuring a convalescent home prevented avoidance of liability within professional services exclusion) *with Hollingsworth v.*

***Commercial Union Ins. Co.***, 256 Cal. Rptr. 357 (Cal. Ct. App. 1989)(injury resulting from ear-piercing service by an employee of a cosmetics shop was held to be a "professional service" even though not requiring extensive training or professional skill); ***Ratliff v. Employers Liab. Assurance Corp.***, 515 S.W.2d 225 (Ky. 1974)(determining whether plaintiff was able to return to a bed unassisted required nurse to exercise professional ability and failure to do so fell within professional services exclusion); *and* ***Mossman v. Albany Medical Ctr. Hosp.***, 311 N.Y.S.2d 131 (N.Y. App. Div. 1970)(decision to use bed rails or not to use bed rails requires professional skill). Therefore, we will apply our previously adopted principles to the particular facts of this case.

¶29. "In determining whether or not a particular act or failure to act is of a professional nature we should look not to the title or character of the party performing the act but to the act itself." ***Marx***, 157 N.W.2d at 872. Inevitably, every service performed, or every activity engaged in, by a physician, dentist, nurse, or lawyer is not a "professional" service. Here we are presented not with a nurse but with a nurse's aide, which the State of Mississippi does not require to be licensed. The State Board of Nursing only provides a certification process for nurse's aides.

¶30. Simply because a nurse's aide may usually be associated with nurses, and because the aide may be exposed to certain activities performed by nurses while trained, does not necessarily mean that bathing is a "nursing treatment" which constitutes a "professional service." The Mississippi State Department of Health, in its requirements for nurse aide training and competency evaluation programs, defines a nurse's aide as "any individual providing nursing and nursing-related services to residents in a facility who is not a licensed health professional, a registered dietitian, or someone who volunteers to provide such services without pay." Although there is no definition for "nursing and nursing-related services," the Department of Health designates the areas of training which every nurse aide course curriculum must provide. The document of requirements lists one category as "Basic Nursing Skills," which includes taking and recording vital signs, measuring and recording height and weight, caring for the residents' environment, recognizing abnormal changes in body functioning and the importance of reporting such changes to a supervisor, and caring for residents when death is imminent. In a separate category, there is a list of "Personal Care Skills," which includes bathing, grooming, dressing, toileting, and other activities. Further, ***Miss. Code Ann.*** § 43-11-1 (c) defines "personal care" in reference to a "nursing home" as "assistance rendered by personnel of the home to aged or infirm residents in performing one or more of the activities of daily living, which includes, but is not limited to the bathing, walking, excretory functions, feeding, personal grooming and dressing of such residents."

¶31. Various state guidelines treat bathing as a personal care skill, not as a basic nursing skill. It is unrealistic to say that the average layperson could not be expected to know personal skills such as bathing, grooming, dressing, and toileting. Further, in this case, Moore exercised no specialized knowledge in giving Evie Burton the bath. She had already been advised to give the bath by Dr. Parsons, so it was only a matter of Moore performing the task. None of the evidence presented in the pleadings, interrogatories or other court papers indicates that Moore sought the help or advisement of a nurse that day before she gave Burton the bath. Only after the blisters appeared did Moore seek the aid of a nurse.

¶32. Further, our jurisprudence requires that the language in insurance contracts, especially exclusionary clauses, be construed strongly against the drafter. ***Nationwide Mut. Ins. Co. v. Garriga***,

636 So. 2d 658, 662 (Miss. 1994). In addition, any ambiguities in an insurance contract must be construed against the insurer and in favor of the insured and a finding of coverage. *Id.* That means that the exclusionary clause here must be interpreted in its entire context--professional services, which include medical, surgical, dental and nursing treatment. In this light, "professional" is a limiting term, not an expansive one.

¶33. The term "nursing treatment" in this case is also ambiguous. Reasonable people could easily differ about whether various actions constitute "treatment," and just as easily, they could differ about whether those "treatments" constitute "professional services." Because the policy did not define these terms at all, there are many ways the terms could be construed, even in the most basic forms. Therefore, the exclusionary clause, on its face, is ambiguous. The error in this case occurred when the trial court determined that the clause was clear and unambiguous. The ambiguity must be clear on the face of the contract, and in this case, it is. Although "professional services" appears to have a slightly clearer meaning, "nursing treatment" could mean anything, because there is nothing within the contract to define it. *See* **Dennis**, 457 So. 2d at 945; *see also* **Ford v. Lamar Life Ins. Co.**, 513 So. 2d 880, 887 (Miss. 1987).

¶34. Although it would be unfair to limit the scope of professional services to just those who practice in the "learned" disciplines, the service provided by the nurse's aide in this case was not of a professional nature. This Court has never before recognized the acts of a non-licensed medical worker as professional. The Mississippi Legislature has been reluctant in the same manner. *See, e.g.,* **Miss. Code Ann.** §§ 15-1-36 (applying statute of limitations to nurses, not aides, for death arising out of course of medical, surgical, or other professional services). This Pool contract, if interpreted as the appellees would suggest, would cover just about all employees, without saying so. This would defeat any incentive that an insurer would have to draft the language in policies and contracts with specificity.

¶35. The goal of any insurance policy is to protect the insured by providing them coverage; however, a policy should be drafted to accommodate the average person who will give its terms a general reading. An insurance policy should be strictly construed against the insurer, and the insurer has the burden of phrasing the terms in clear language. There is no enabling language, such as "incident to treatment" or "arising out of business operations," present in the policy under review, so this Court will not read into the policy something that may or may not have been intended. It can hardly be said that such an ambiguity defeats the probable intentions of the parties, when the parties could have simply included all services, rather than qualifying actions of Choctaw County employees as professional services, and all treatment, not just nursing treatment.

¶36. It cannot be forgotten that the summary judgment evidence must be taken in the light most favorable to the non-movant, which is in this case, the appellant. Moore stated in her affidavit that she performed nursing services, but these statements were self-serving and controvertible. Although the record indicated that her training included exposure to nursing activities, there is no indication that she actually performed any, especially on the date that Evie Burton was burned. More specifically, the bathing activities that she performed were not a part of any prescribed treatment, to which Dr. Parsons swore in his affidavit.

¶37. In summary, then, the term "nursing treatment" within the exclusionary clause is ambiguous. The

trial court erred in finding it unambiguous, and the question of whether Rochelle Moore's actions on August 29, 1993, constituted "nursing treatment" should have been submitted to a jury in the face of the ambiguity.

## III.

¶38. A factual dispute exists which precludes summary judgment in this case. Rochelle Moore made conclusory statements within her affidavit, to the effect that she gave "nursing treatment." This statement was self-serving, and cannot form the basis of summary judgment evidence. Nevertheless, Dr. Parsons gave an affidavit which readily controverts Moore's statement. He testified that the bath that Moore gave Evie Burton was not a part of any therapeutic treatment. This created a factual dispute that must be resolved by a jury. Further, the trial court's determination that the term "nursing treatment" was clear and unambiguous was erroneous. It is for these reasons that the order granting summary judgment on the state claims in favor of all defendants is reversed and remanded. The trial court is ordered to proceed with a trial on the merits on all issues.

¶39. **REVERSED AND REMANDED.**

**SULLIVAN, P.J., PITTMAN, BANKS, ROBERTS AND SMITH, JJ., CONCUR. LEE, C.J., AND PRATHER, P.J., CONCUR IN RESULT ONLY. MILLS, J., NOT PARTICIPATING.**