# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2003-CA-00874-SCT

*FARMLAND MUTUAL INSURANCE COMPANY*

*v.*

*MITCHELL SCRUGGS, EDDIE SCRUGGS,*
*SCRUGGS FARM SUPPLY, INC., SCRUGGS FARM*
*JOINT VENTURE, HES FARMS, INC., MES FARMS,*
*INC. AND MHS FARMS, INC.*

| | |
|---|---|
| DATE OF JUDGMENT: | 12/23/2002 |
| TRIAL JUDGE: | HON. RICHARD D. BOWEN |
| COURT FROM WHICH APPEALED: | LEE COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | J. COLLINS WOHNER |
| | JAMES A. BECKER, JR. |
| | MARC A. BIGGERS |
| | STEVEN CAVITT COOKSTON |
| ATTORNEYS FOR APPELLEES: | JAMES LAWTON ROBERTSON |
| | JIM WAIDE |
| | LISA SCRUGGS |
| NATURE OF THE CASE: | CIVIL - INSURANCE |
| DISPOSITION: | REVERSED AND RENDERED - 09/16/2004 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE SMITH, C.J., CARLSON AND GRAVES, JJ.**

**GRAVES, JUSTICE, FOR THE COURT:**

¶1.    For centuries farmers have saved their planting seed.  This is a process by which a farmer selectively "keeps back" some of his seed, particularly from those crops that have performed well.  Instead of purchasing new seed every year, a savvy farmer can save time and expense and increase harvests by using saved seed.  One simply takes seeds from the most productive plants and attempts to multiply them through successive years of re-planting.

¶2.     Modern technologies have drastically changed all facets of farming—even the very crops that farmers grow.  In 1996 the Monsanto Company introduced types of soybean and cotton seeds that were resistant to the popular herbicide Roundup, also manufactured by Monsanto.  The seeds were "Roundup Ready"—genetically altered to resist the very effective herbicide.  This drastically increased the ability of farmers to inhibit weed growth and increase crop harvests.

¶3.     Yet complicated legal theory was intertwined with the seeds.  The seeds were no longer simply "seeds"—they fell under the protection of two separate registered United States Patents, Nos. 5,633,435 (the "435" patent) and 5,352,605 (the "605" patent).  Because the seeds had a high value due to their patented resistances, Monsanto did not just sell the seeds: it actually licensed them to seed companies and required those licensees to also license them  to individual customers.  The licenses were strict; purchased seed could only be used for one planting season and the seed could not be saved.  *See generally Monsanto Co. v. McFarling*, 363 F.3d 1336, 1338-39 (Fed. Cir. 2004).

¶4.     Monsanto quickly discovered that many customers were not complying with the licensing requirements and began aggressive litigation to protect its product.  The company's concerns of losing control of the product were grounded in fact:  one source has estimated that 36 bags of seed could be generated from just one bag of the patented seed in just one year.  Under that reasoning, one bag of patented seed might produce over forty-six thousand bags of seed in only three years of saving the seed. The users of the saved seed also realized a deep discount, since they could avoid the premiums Monsanto charged and also avoid the licensing fee, undercutting Monsanto's profits and the value of the 435 and 605 patents.

¶5.     In 2001 Monsanto filed a complaint against Mitchell and Eddie Scruggs and their supply company, Scruggs Farm Supply, Inc.,  located in Lee County, Mississippi.  Monsanto alleged the Scruggses obtained

a supply of unlicensed Roundup Ready seed from an unauthorized source and planted it in 2000. The company alleged the Scruggses were seen spraying Roundup on a field planted with the non-licensed seed—but that the crops were not damaged. This was a telltale sign the seed was Roundup Ready. A sample of the unlicenced seed was obtained—retrieved without trespass from a public right-of-way—and laboratory analysis confirmed its identity as Roundup Ready.

¶6.     Monsanto sued the Scruggses under seven theories of recovery. The first five were for the infringements of patents 435 and 605 and three other patents, allegedly committed by the defendants "with full knowledge and with notice [of the violation] of Monsanto's patent rights." Fifth, Monsanto alleged the intentional tort of conversion—that the "defendants intentionally and wrongfully exercised dominion, ownership and control over Roundup Ready technology." This action was allegedly "malicious and willful," to the point "Monsanto is entitled to punitive damages." Lastly, Monsanto alleged that the defendants were unjustly enriched through their actions.

¶7.     That lawsuit is what triggered the case before us. In 1999 the Scruggses purchased insurance from Farmland Mutual Insurance Company, and later expanded their coverage to include a commercial general liability policy ("GCL") and an umbrella policy (collectively "the policy"). The GCL had a $2 million limit to liability, and the umbrella added another $20 million on top of that. The terms of the two parts of the policy are substantially the same.

¶8.     The Scruggses notified Farmland of the pending suit, but were flatly denied coverage on the basis that their actions were intentional. The Scruggses filed this suit against their insurer in the Circuit Court of Lee County, and this case was appealed to us after the circuit court disposed of three motions. First, it denied summary judgment for Farmland, who urged that it was not required to defend the suit. Second, the trial court entered partial summary judgment for the Scruggses, determining that the Farmland policy

3

did cover Monsanto's suit and that Farmland had a duty to defend. Third, the circuit court entered a preliminary injunction requiring Farmland to defend the suit and also pay all current and outstanding legal bills; at the time the preliminary injunction was entered that amount was roughly $300,000, and the order noted that another $500,000 might be incurred.

¶9.     Determined that the injunction and partial summary judgment are incorrect and that the policy does not cover the Monsanto suit, Farmland appeals that decision to this Court, assigning three errors. Despite the technological complexity of the underlying facts, we only need to address one basic legal issue to resolve this matter: does the Scruggses' insurance policy cover the torts complained of in Monsanto's lawsuit? After a review of our jurisprudence and the language of the policy, we answer that question in the negative.

## DISCUSSION

¶10.     The proper construction of an insurance contract provision is a question of law which we review de novo. *Radmann v. Truck Ins. Exchange*, 660 So.2d 975, 977 (Miss. 1995). We review a trial court's grant of a summary judgment motion de novo as well. *Miller v. Meeks*, 762 So.2d 302, 304 (Miss. 2000). We have long held that when a contract is clear and unambiguous to its wording, its meaning and effect are matters of law. *U. S. Fidelity & Guar. Co. v. Omnibank*, 812 So.2d 196, 198 (Miss. 2002); *Sumter Lumber Co. v. Skipper*, 183 Miss. 595, 608, 184 So. 296, 298 (1938) ("When the language of the deed or contract is clear, definite, explicit, harmonious in all its provisions, and free from ambiguity throughout, the court looks solely to the language used in the instrument itself, and will give effect to each and all its parts as written").

¶11.     It is also bedrock law "that ambiguous terms in an insurance contract are to be construed most strongly against the preparer, the insurance company." *Omnibank*, 812 So.2d at 198; *Caldwell v.*

4

*Hartford Acc. & Indem. Co.*, 248 Miss. 767, 776, 160 So.2d 209, 212-13 (1964) ("The rule that the insurance policy prepared by the insurer must be construed more strongly against the insurance company, and that any fair doubt should be resolved in favor of the insured, is so well-settled in the law of insurance that we hesitate to cite any cases"). We must refrain from altering or changing a policy where the terms are unambiguous, even if there is a resulting hardship on the insured party. *Titan Indem. Co. v. Estes*, 825 So.2d 651, 656 (Miss. 2002); *State Farm Mut. Auto. Ins. Co. v. Scitzs*, 394 So.2d 1371, 1373 (Miss. 1981). Like any other contract, if an insurance contract is plain and unambiguous, it should be construed as written. *Estes*, 825 So.2d at 656; *Scitzs*, 394 So.2d at 1372 ; *see generally* Jeffrey Jackson, *Mississippi Insurance Law & Practice* § 1:7 (2001).

¶12. The Scruggses argue they are protected from Monsanto's suit by virtue of multiple sections in their Farmland insurance policy, namely the "Property Damage" section, the "Personal Injury" section, the "Duty to Defend" section, and the absence of pertinent exclusions and the inapplicability of the intentional acts exclusion. We turn to that policy to ascertain its terms.

### *The Policy*

¶13. It is critical to understand the terms used between the parties in construing any contract. Many contracts are highly specific in defining terms to avoid the specter of ambiguity. That specter arises when a reasonable person could have understood the terms to have more than one reasonable meaning. *Universal Underwriters Ins. Co. v. Ford*, 734 So.2d 173, 176 (Miss. 1999); *J & W Foods Corp. v. State Farm Mut. Auto. Ins. Co.*, 723 So.2d 550, 552 (Miss. 1998); Jackson, *Mississippi Insurance* at § 1:5. Simply because the parties disagree about the meaning of a provision of a contract does not make the contract ambiguous as a matter of law. *Burton v. Choctaw County*, 730 So.2d 1,

6 (Miss. 1997). The Scruggses claim coverage under three sections of the policy: bodily injury and property damage coverage, personal injury coverage, and advertising injury coverage. Farmland denies any form of coverage.

### *Bodily Injury and Property Damage*

¶14. Under the "Bodily Injury and Property Damage" section of the policy, Farmland agreed to "pay those sums that the insured becomes legally obligated to pay as damages, including punitive and exemplary damages, because of bodily injury or property damage to which this insurance applies . . . The bodily injury or property damage must be caused by an occurrence . . . We will have the right and the duty to defend any suit seeking those damages."

¶15. "Bodily injury" is defined as "bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time." The Scruggses argue that the policy protects them under the policy since Farmland contracted to "pay those sums that the insured becomes legally obligated to pay as damages, including punitive and exemplary damages, because of bodily injury or property damage to which this insurance applies."

¶16. Yet the policy flatly states that "[t]he bodily injury or property damage *must* be caused by an occurrence." (emphasis added). The contract itself defined that term, along with 66 others. The word "occurrence" is defined as "an **accident**, including continuous or repeated exposure to substantially the same general conditions." The word "accident" is bolded in the definition, as are many other words throughout the policy, indicating that they are also defined.[1] In turn, the word "[a]ccident means a sudden unforeseen or unintended event."

¶17. Thus, if there were no "occurrence," the policy does not cover the situation. In *Omnibank* a bank

---

[1] For the sake of clarity the bolded words of the policy will not be emphasized in this opinion.

6

had allegedly "wrongfully force-placed collateral protection insurance" on several of its customers. 812 So.2d at 198. When the customers sued, the bank's insurer refused coverage, and the bank filed suit claiming that the insurer had a duty to defend. *Id.* The insurer refused coverage because the actions of the bank were intentional, and the "occurrence[s]" covered in the insurance were defined simply as an "accident." *Id.* at 200.

We determined that "[a]n accident by its very nature, produces *unexpected and unintended* results . . . [and so] [i]t follows that bodily injury or property damage, *expected or intended* from the standpoint of the insured, *cannot* be the result of an accident." *Id.* (emphases added).

¶18.    The same common sense reasoning applies here. All of Monsanto's claims are styled as "willful" or "intentional," with the last, unjust enrichment, based upon alleged profits from those intentional torts. Monsanto specifically asked for treble damages (allowable under 35 U.S.C. § 284) for patent infringement because of the "knowing, willful, deliberate and conscious infringement of the patent rights at issue." And there is no doubt that conversion is an intentional tort. The entire complaint is carefully worded with repeated references to the Scruggses' intentional conduct.

¶19.    A liability insurance company has an absolute duty to defend a complaint which contains allegations covered by the language of the policy, but it has absolutely no duty to defend those claims which fall outside the coverage of the policy. *Sennett v. U.S. Fidelity & Guar. Co.*, 757 So.2d 206, 212 (Miss. 2000) (quoting *Moeller v. Am. Guar. & Liability Ins. Co.*, 707 So.2d 1062, 1069 (Miss. 1996)); *see also* Jackson, *Mississippi Insurance* § 10:3 ("The general rule in Mississippi and elsewhere is that a liability insurer has the duty to defend claims falling within coverage under the policy"). To determine if a duty to defend exists one turns to the allegations of the complaint. *Sennett,* 757 So.2d at 212 (quoting *Delta*

7

*Pride Catfish, Inc. v. Home Ins. Co.*, 697 So.2d 400, 403 (Miss. 1997)).[2]

¶20.    From the face of Monsanto's complaint, only intentional torts are alleged.  In addition, the Scruggses' pattern of conduct has been one of intentional acts.  Indeed, it took a preliminary injunction by a federal court to stop the Scruggses  from using or selling the seeds.  *See Monsanto Co. v. Scruggs*, 249 F. Supp. 2d 746 (N.D. Miss. 2001).  The Scruggses never disputed that the conduct was intentional, only that the effects were unintended; in fact, they dispute  there was any harm at all.  They offer that Monsanto's claim of patent infringement and damage to trade reputation is "utter nonsense, [since] the farmers saving Roundup Ready soybeans and replanting them in future years is no more harmful to Monsanto's slogans, brand names and trade reputation th[an] the used car salesman damages Ford Motor Co. by selling used Fords."

¶21.    That analogy does not fit the facts at hand.  There is nothing illegal about selling used cars, but the cars must not be stolen.  The seeds at issue are like a stolen Ford, for at the hearing for the preliminary injunction in federal court "Scruggs also admitted that [he and the other defendants] never entered into a commercial license for authorized use of the plaintiffs' patented biotechnology."  *Scruggs*, 249 F. Supp. 2d at 751.  In the federal court the Scruggses also contended in part that the Monsanto patents were invalid, that there was patent misuse, and that there were antitrust violations.  *Id.* at 752-54.  The district court dismissed these claims as "a charade."  *Id.* at 754.

---

[2] In Mississippi an insurer does have a duty to defend where a complaint fails to state a cause of action covered by policy but the insured informs the insurer that the true facts are inconsistent with the complaint, or where the insured learns from an independent investigation that the true facts present the potential liability of insured the insured.  *Mavar Shrimp & Oyster Co. v. U. S. Fidelity & Guar. Co.*, 187 So.2d 871, 875 (Miss. 1966) (internal quotations & citations omitted); see also Jackson, *Mississippi Insurance* § 10:5.  In the underlying legal matter that brought the case at hand the Scruggses do not dispute the facts which triggered the complaint, but rather argue  that Monsanto cannot legally prevent farmers from saving their seed.

¶22. The Scruggses may not like the consequences of their intentional actions and may dispute the law that protects Monsanto against their actions, but that does not mean their liability insurer must be made a party to such an action. The reasonable and unambiguous insurance contract between the Scruggses and Farmland excludes all intentional acts. Therefore, there is no coverage under the "Bodily Injury and Property Damage Liability" section of the policy.

¶23. Moreover, if the allegations of the complaint had not been intentional in nature, a policy exclusion may have applied. Section III (A)(1)(b)(12) of the policy specifically excludes genetically modified seed from policy coverage. The section reads "[t]his insurance *does not apply* . . . [t]o bodily injury or property damage arising out of . . . the production, distribution, delivery or sale of genetically altered or genetically engineered seed if such injury or damage arises out of such genetic engineering or genetic alteration." (emphasis added). The Monsanto seed is certainly genetically modified, and in part this action arose because the Scruggses were selling the seed in violation of Monsanto's patent. This further undermines their claims for coverage since there is a specific exclusion on point.

¶24. Furthermore, as a matter of public policy, people and businesses cannot purchase insurance coverage for illegal activities. *Delta Pride Catfish, Inc. v. Home Ins. Co.*, 697 So.2d 400, 405 (Miss. 1997). For we do not allow corporations or persons "'to insure themselves against acts prohibited by law.'" *Id.* (*quoting Graham Resources, Inc. v. Lexington Ins. Co.*, 625 So.2d 716, 721 (La. Ct. App.1993)). In *Graham*, the Louisiana Court of Appeals refused to allow an insurer to protect itself against the illegal act of securities fraud; the illegal act of patent infringement is likewise unprotected by coverage.

¶25. There are therefore three reasons why coverage must be denied; first, the plain face of Monsanto's complaint does not trigger the policy's coverage and duty to defend; secondly, the torts complained of were

intentional; and last, public policy compels us to refuse coverage for intentional and illegal actions.

### *Personal and Advertising Injury Coverage*

¶26.    Regarding personal and advertising injury coverage,[3] the policy states that Farmland "will pay those sums that the insured becomes legally obligated to pay as damages including punitive and exemplary damages, because of personal injury or advertising injury to which this insurance applies."    The policy specifically states that "[n]o other obligation or liability to pay sums or perform acts or services is covered *unless explicitly provided for* [under the policy]." (emphasis added).

¶27.    The policy does not cover the torts Monsanto has complained of; indeed, as discussed *supra*, one cannot insure oneself for illegal actions. The Scruggses struggle mightily to suggest that coverage might fall under the provision for personal and advertising injury.  This strains the plain words of the contract.

¶28.    The Scruggses argue that if "Farmland wished to exclude patent claims, it could have easily done so."  This is true, but the policy expressly provides that coverage only occurs when "explicitly provided for."  Patent infringement is not discussed anywhere in the policy and will not be inferred.  Again, we will refrain from altering or changing a policy where the terms are unambiguous, even if there is a resulting hardship on the insured party. *Estes*, 825 So.2d at 656.  Accordingly, when an insurance contract is plain and unambiguous, it should be construed as written. *Id.*

¶29.    If the Scruggses were concerned about securing insurance to protect against patent infringement, they should have sought out an insurer that provided such coverage or attempted to contract with Farmland

---

[3] Although the order of the trial court addressed these two concepts separately, they are grouped together under the policy as "Personal and Advertising Injury Liability."  Accordingly, we will consider them together.

for such coverage.[4]  It cannot be claimed that the policy protects them from liability when the policy specifically excludes situations that are not included in the coverage.

¶30.    The contract is plain and unambiguous, and we will not distort it to find coverage where none exists. As noted *supra*, there are three more reasons why coverage must be denied; first, the plain face of Monsanto's complaint does not trigger the policy's coverage and duty to defend; secondly, the torts complained of were intentional; and last, public policy compels us to refuse coverage for intentional and illegal actions.

## CONCLUSION

¶31.    Accordingly, since the insurer has no duty to defend the intentional actions of the Scruggses  to a third party, the order of the Lee County Circuit Court is reversed.  The partial summary judgment in favor of the Scruggses finding coverage under the policy and regarding Farmland's duty to defend is reversed. The preliminary injunction requiring Farmland to pay for legal fees is reversed.  Since there is no duty for Farmland to defend the suit against Scruggs, summary judgment is entered on its behalf.

¶32.    **REVERSED AND RENDERED.**

**SMITH, C.J., WALLER AND COBB, P.JJ., EASLEY, CARLSON, DICKINSON AND RANDOLPH, JJ., CONCUR. DIAZ, J., NOT PARTICIPATING**.

---

[4] Such coverage exists.  *See* Joby A. Hughes & Kate L. Birenbaum, *Insuring Intellectual Property Risks:  Creative Solutions on the Cutting Edge*, 568 PLI/Pat 203, 212-13 (1999): "Infringement coverage (or 'defensive' coverage) is associated with being sued by a third party for infringement of that third party's rights. Essentially, defensive coverage seeks to cover the legal expenses and also the damages associated with 'trespassing' on another's rights, whereas, enforcement coverage pays for the legal expenses and possibly the loss of value due to 'trespassers' on that property. This is the coverage that most traditional insurers attempt to cover in order to fill a perceived gap in the commercial general liability policy's advertising injury clause."

11