788 So.2d 76 (2001)
Karen QUAY, as Mother and Next Friend of Leigh Lamson, Minor, and on Behalf of the Heirs of William Lamson, II, Deceased, Appellant,
v.
Archie L. CRAWFORD and Shippers Express, Inc., Appellees.
No. 98-CA-00696-COA.
Court of Appeals of Mississippi.
January 9, 2001.
Rehearing Denied March 13, 2001.
Certiorari Denied June 21, 2001.
Suzanne Griggins Keys, Isaac K. Byrd Jr., Jackson, Robert George Clark III, Attorneys for Appellant.
B. Stevens Hazard, Quentin A. Daniels, Gregory M. Johnston, Jackson, Attorneys for Appellees.
*77 EN BANC.
IRVING, J., for the Court:
¶ 1. Karen Quay appeals from an order of the Circuit Court of Hinds County granting summary judgment against her on her complaint against Archie L. Crawford and Shippers Express, Inc., for the wrongful death of William Lamson, II. In this appeal, Quay argues that the trial court erred in granting summary judgment because there exist genuine issues of material facts regarding the functioning of the rear lights on the Shippers Express trailer with which Lamson collided causing his death. We agree and reverse and remand this case for a full hearing on the merits.

FACTS
¶ 2. On February 8, 1995, around 11:00 p.m., William Lamson left Jackson, Mississippi going to Grenada to meet a truck bringing the Commercial Appeal newspaper from Memphis, Tennessee for distribution in the Jackson, Mississippi area. He was driving a Chevrolet Chevette and had made this trip many times, as his job required him to pick up the papers and distribute them to various vendor sites in the Jackson area. On this night, he never arrived at his destination because somewhere along a stretch of Interstate Highway 55, south of Vaiden, he collided with the rear trailer of a Shippers Express tandem trailer rig operated by Archie L. Crawford and was killed, apparently instantly. Other facts will be developed as appropriate in the discussion of the issue.

ANALYSIS AND DISCUSSION OF THE ISSUE

1. The Taillights on the Trailer
¶ 3. In her complaint against Crawford and Shippers Express, Quay alleged, inter alia, that Crawford and Shippers Express were negligent in not having proper warning reflectors and lights on the tractor and tandem trailers, and in operating an inadequately-maintained vehicle. It is Quay's theory that there were either no rear lights or barely illuminated lights on the rear tandem trailer.
¶ 4. According to the report of Officer Cotten, who was the highway patrolman that investigated the accident, there were no eyewitnesses to the accident. He testified that no one, professing to be a witness, ever approached him, and he did not recall another tractor trailer being parked up the road from the scene of the accident.
¶ 5. Despite the fact that no witness presented himself to the investigating officer on the scene the night of the accident, a William Windsor, who claims to have been an eyewitness to the accident, was discovered or appeared after litigation had commenced. He claims to have passed the Shippers Express tractor trailer rig and observed that all lights on the tractor trailer rig were working properly. Shortly after passing the Shippers Express rig, according to Windsor, he pulled off the road to get a drink of water. He was off the road for only a short while, and, as he was going down the entrance ramp to resume his journey, he saw the Shippers Express truck go by. Shortly thereafter, he saw a car approach from the rear and pass him. He estimated the speed of the car, as it passed, to be approximately ninety miles an hour. He said the car was weaving a little bit, nearly side-swiped him, and almost hit a mile marker post. He thought the driver was drunk. He said that approximately a half mile up the road near the top of a hill, he saw a "big flash," and he knew the car, which had just passed him, had run into the back of the Shippers Express tractor rig.
*78 ¶ 6. Windsor claims to have pulled his rig in the left lane to pass the Shippers Express rig which was in the right lane. After passing the Shippers Express rig, Windsor pulled off the road, set his emergency brakes, put his four-way blinkers on and walked over to the Shippers Express rig. He told the driver of the Shippers Express rig that a car was behind the Shippers Express rig. They then went to the back of the Shippers Express rig where they found Lamson's car wedged underneath the trailer of the Shippers Express rig.
¶ 7. Crawford and Shippers Express's claim that no genuine issue of material fact exists rests primarily on Windsor's testimony that the rear lights on the Shippers Express rig were operable, and that Lamson simply ran into the back of the Shippers Express rig. In addition to Windsor's testimony, the record contains an affidavit of Glenn Porch, Director of Operations for Shippers Express, Inc. The affidavit is not referenced as being a part of either the motion for summary judgment or the response to the motion for summary judgment. The affidavit appears to bear a February file date while the motion for summary judgment bears a January 20 file date, and the response to the motion for summary judgment bears a February 4 file date. The affidavit is filed among the exhibits attached to the response but, as stated, does not appear to be part of the response. Nevertheless, the affidavit states that following the accident, Glenn Porch followed the Shippers Express rig as it was leaving the scene of the accident and observed that all lights on the tractor and trailers were operable and functioning properly.
¶ 8. Shippers Express and Crawford also offered excerpts from Crawford's deposition wherein he stated that he checked the lights on the truck and trailers around 11:40 p.m. at the Jackson terminal. He related the accident this way:
Q. Now after you heard that bump, did you startdid you lose speed or did you maintain your speed?
A. I maintained my speed.
Q. Until it suddenly stopped, until the trailer suddenly stopped because the brakes locked up?
A. Yeah. It started tomy buzzer come on and I realized then something was going on, and I said, "I better stop and pull over and see what done happening." By that time, those buttons jumped out and the trailer locked down, and I tried to move and couldn't move, and, so, I gets out and go back there and look and I see a car back there, and I go back to my tractor and get my flashlight and go back there and shine it.

(emphasis added).
¶ 9. As stated, Windsor, who belatedly claimed to be an eyewitness to the accident, told a different story. This is what he said:
And I got out of my truck, set my emergency brakes and put my four-ways on and got out of my truck and walked over there, and I said, "Man, there's a car behind your truck." And I said, "I don't know if he was drunk or what." I said, "he was all over the road. He actually just about hit me," and he did. And we went back there and there was newspapers all in his car, I believe it was a little Chevy Chevette, or something like that, and it took us a minute to find him, he was down in the floorboard, and he just run into Shippers Express, you know.
(emphasis added).
¶ 10. In opposition to the motion for summary judgment, Quay offered, inter *79 alia, (1) repair records which showed the repairs that were made to the tractor and trailer as a result of the February 8 accident, (2) the answers to her first set of interrogatories, (3) excerpts from the deposition of Daniel Skinner who inspected the truck and trailer for damages after the accident, (4) excerpts from the deposition of David McBroom who admitted doing repair work on the tractor on May 9, (5) an affidavit from William David Barrett which stated that Barrett did the repair work on May 8, 1995, and (6) affidavits from John Eubanks and Douglas Bynum.
¶ 11. For some unexplained reason, the repairs were done over a period of three months beginning February 11, 1995, which was two days after the accident, and concluding with repairs on May 8, 9, 10 and 19, 1995.[1] According to excerpts from David McBroom's deposition, he performed the repair work on February 11 and May 9 or 19. As stated, Barrett's affidavit states that the repair work on May 8 was performed by Barrett. In that affidavit, Barrett said the repair order reflected all the repairs he made and that he did "nothing to the taillight on the trailer." There is no clear indication in the record as to who made the repairs on May 10, and if McBroom did not make the repairs on both the 9th and 19th of May, we also are without knowledge as to who made the repairs for the day he did not.
¶ 12. As stated, Daniel Skinner did the inspection of the tractor and trailer following the accident. He described the inspection and damage this way:
Q. Now, after the accident in February of '95, did you do an inspection of this trailer?
A. Yes, ma'am. It was brought in and we did the repairs on it, uh-huh.
Q. Now, who would have determined what repairs were needed to be done?
A. Well, I went over it myself, and Johnny Babb was one of them that went over it, and I believe he noticed a lot of things, and, of course, there was a lot of things on it, and we just all together noticed, you know, any repairs that it needed I could be correcting them, you know.
* * * *
Q. And there wasn't anythe impact didn't affect the lights at all; is that correct?
A. I don't think it did, no, ma'am it didn't. Because I believe the lights were still burning on it all even though it still got an inspection and everything.
¶ 13. Crawford provided the following answers to Quay's interrogatories:

INTERROGATORY NO. 1: While you were driving on the night of the accident, just prior to the accident, was there anything wrong with the lights in the tractor (including the headlights, dash lights, switches, etc.)? If so, please describe the problem, who you reported it to and what was done to alleviate the problem.

RESPONSE: There was nothing wrong with the lights in the tractor on the night of the accident.

INTERROGATORY NO. 2: At the end of your trip (post trip), was there anything wrong or any problem noted by you with the lights in the tractor (including the headlights, dash lights, switches, *80 etc.)? If so, please describe the problem, who you reported it to and what was done to alleviate the problem.

RESPONSE: There was nothing wrong with the lights in the tractor at the end of my trip on the night of the accident.
¶ 14. The February 11 repair record, which was the first post-accident repair and made just three days after the accident, showed that two feet of wire had been replaced on the tractor and six wire connectors had been utilized to connect some wires which were not identified. Additionally, the repair order showed that an unidentified light had been repaired. From all indications, these repairs were made before the tractor and trailers were placed back in action following the accident. It is not clear from the record where all of the repairs were made.
¶ 15. While it is unclear where the February 11 repairs were made, it is clear that McBroom made them, and the following excerpts from his deposition are instructive:
Q. Okay. So this says that on 2-11-95, would that be the date that this work actually got done?
A. Yes, ma'am.
Q. It indicates that you did some repairs
A. Uh-huh.
Q. And this is on2042 is the tractor?
A. Yes, Ma'am, it would be a tractor.
Q. This would have just been like a day or two after the accident. Can you recall what it was that you repaired on the tractor?
A. No, ma'am.
Q. Looking at the parts that you used, can you tell me what that description is, I can't make it out, for the four-something another?
A. 725106 is a wire connector.
Q. It's a wire connector?
A. Yes, ma'am.
Q. What is a wire connector?
A. It's a little thing about this long you connect two wires with and you just crimp it to connect wires.
Q. And what part of the tractor would that have been connecting up? Do you know?

A. I don't know which part of the what II don't remember fixing lights. I don't know.
* * * *
Q. When it says repair lights, do know which [sic] lights you might
A. No.
Q. You're not sure what you're repairing?

A. No.
(emphasis added).
¶ 16. The May 8 repair order for the tractor and trailer showed that two lights were repaired, one light lens, six light bulbs and a 7 way light receptacle had been replaced. Barrett's affidavit indicates that it was clearance lights to the front of the trailer that he repaired on May 8. However, four of the light bulbs that were replaced on May 8 bore part number 194, and Skinner testified by deposition that the bulbs bearing part number 194 were little marker bulbs along the topside of the trailer and that all the bulbs along the top of the trailer were replaced. One of the lights that was replaced on May 8 bore part number 426R, and Skinner testified that this was a taillight. This testimony concerning the taillight is in direct conflict with Barrett's affidavit. Remember, Barrett said he did "nothing to the taillights on the trailer" and that he was the one who did the repairs to the trailer on May 8.
*81 ¶ 17. In Eubanks's affidavit, offered in opposition to the motion for summary judgment, Eubanks said the following:
I inspected the Shipper's Express trailer shortly after the accident in question. I have also reviewed the answers to discovery provided, depositions, and maintenance/repair records on the tractor and trailer. From these materials and from my examination, I am of the opinion that the rear lights of the trailer in question were not in good working condition and/or even operational and therefore, the negligence of the defendants in failing to have properly operational lights would be a proximate or contributing cause of this accident and Mr. Lamson's death.... Also, it appears from the tickets on the repairs to the trailer, and from the testimony of the person who did the repairs, that the taillight bulb had blown and needed replacement. This repair not being caused by improper welding procedures indicates that at the time of the accident, that taillight was not working. Moreover, though [sic] trailer was not fitted with any reflective tape to help with conspicuity [sic] of the trailer.
(emphasis added).
¶ 18. It appears to us that a fair assessment of the proof offered for and against the motion for summary judgment left a glaring question of fact as to whether the lights on the rear trailer of the Shippers Express rig were functioning properly so as to adequately illuminate the rear of the trailer. We fully realize that Quay offered only circumstantial evidence to contradict the direct testimony offered by Crawford and Shippers Express that the lights on the rear trailer were functioning properly, but we are not aware of any case law which holds that circumstantial evidence is insufficient to raise a question of fact in the summary judgment context.
¶ 19. As to the direct testimony offered by Crawford and Shippers Express, we note that all of it, except the testimony of William Windsor, was from Crawford and employees of Shippers Express. Clearly the testimonies of Crawford and Glenn Porch, Director of Operations for Shippers Express, are self-serving. Self-serving statements cannot form the basis of summary judgment evidence. See Burton v. Choctaw County, 730 So.2d 1 (¶ 38) (Miss.1997).
¶ 20. The dissent correctly points out that Burton "did not overrule countless summary judgment decisions in which the evidence comes from the parties involved" and that "[t]estimony from parties and their employees is not objectionable at trial because of their interests in the outcome." We cannot know whether it was the intent of the Burton court to expand the well established body of summary judgment law or to simply restate in a different way some of its cogent principles, but we can and do accept Burton's plain and unambiguous holding that self-serving testimony can never be the basis for summary judgment. We point out, however, that it makes sense to require something other than a party's sworn affidavit to support a motion for summary judgment. If that should be all that is required, it appears to us that summary judgment actions would be reduced to a swearing match between the parties, and that, in our opinion, would result in judicial gridlock with one party swearing and the other party counter-swearing with respect to the crucial issues of fact. But even if Crawford's and Porch's testimony is considered evidentiary, Burton notwithstanding, that does not negate the fact that it was placed in dispute by the circumstantial evidence offered by Quay.
¶ 21. According to Crawford, after the impact, he tried to move and could not. *82 He then got out, took his flashlight, went to the back of his rig and shined the flashlight to see what had happened. According to Windsor, Windsor got out of his truck, "walked over there" and said, "Man, there's a car behind your truck." Crawford makes no mention of Windsor. Surely, the failure of Crawford to mention this episode that Windsor contends occurred, raises a question of fact as to whether Windsor was in fact an eyewitness to the accident. This conclusion also is buttressed by the fact that the investigating officer did not see or speak with Windsor at the scene.
¶ 22. In addition to the glaring differences between the versions given by Crawford and Windsor, there is additional evidence casting a dark shadow of suspicion on Windsor. This additional evidence also points to a conclusion that Windsor was not a witness to the accident. As stated, Windsor testified that he saw a "big flash," and that Lamson's vehicle was traveling around ninety miles per hour.
¶ 23. The American Heritage College Dictionary, 3rd edition, 1993, defines "flash" as "a sudden, brief, intense display of light." The evidence is undisputed that Lamson's vehicle did not burst into flames upon impact. The headlights of Lamson's vehicle burst as a result of the impact, but the bursting of headlamps that were already burning would cause a sudden darkness, not a sudden, brief, intense display of light. A good example of a "flash" occurs when one walks into a dark room, flips the electrical switch and the light bulb burns a split second but suddenly blows.
¶ 24. Robert Cooper did an analysis of the accident and concluded that the impact speed of Lamson's vehicle was approximately 28 miles per hour and that the forward speed of Lamson's vehicle was between 57 and 62 miles per hour. This evidence is in direct conflict with Windsor's testimony that Lamson's vehicle was going approximately 90 miles per hour.
¶ 25. As pointed out earlier, Windsor also testified that it was he who informed Crawford that a vehicle was underneath the second trailer. This testimony, as stated, contradicts Crawford's testimony, and appears to be an attempt to synchronize Windsor's testimony with the fact that the Shippers Express rig traveled approximately 403 feet with Lamson's car in tow underneath before Crawford discovered it was there. However, the attempt at synchronization, if indeed that is what it was, fails in light of Crawford's testimony that it was the locking of the brakes on the rig that caused him to stop and investigate.
¶ 26. In light of the testimony given by Windsor and Crawford, whether Windsor was an eyewitness to the accident is a material fact, and we conclude a genuine issue exists with respect to this fact. We recount the crucial factual points of Windsor's testimony. First, he thought Lamson was drunk. Toxicology reports, which were offered in opposition to the motion for summary judgment, showed that no alcohol or drugs, other than caffeine, were found in Lamson's blood. Caffeine is hardly a drug that induces sleep, quite the contrary. Windsor put Lamson's speed at 90 miles an hour. Robert Cooper, Quay's accident reconstructionist put Lamson's speed at 57 to 62 miles per hour. Windsor said he saw a "big flash." The evidence is uncontradicted that no fire occurred upon impact, and the sudden extinguishment of burning lights produces darkness, not a "big flash." Windsor said he alerted Crawford to the fact that Lamson's car was underneath Crawford's rig. Crawford said that he discovered the car himself after his forward movement was made virtually impossible by the locking of his brakes. Windsor said he and Crawford went to the rear of Crawford's rig and *83 discovered Lamson's car. Crawford said he went alone with his flashlight.
¶ 27. Quay, as the non-moving party, was required to produce supportive evidence of significant and probative value in opposition to the motion for summary judgment. But Quay was required to go forth and produce such evidence only if Crawford and Shippers Express made a prima facie case that no genuine issue of material fact exists. The burden of persuasion remains with the moving party.
¶ 28. The excerpts from the depositions of Windsor and Crawford were offered in support of Crawford and Shippers Express's motion for summary judgment. Their testimony, without a doubt, raises a serious question of whether Windsor was in fact a witness to the accident. Added to this mix is the accident report and the testimony of the investigating highway patrolman who said there were no witnesses at the scene of the accident, and none contacted him. Clearly, the patrolman inquired of Crawford whether there were any witnesses to the accident. Had the conversation between Crawford and Windsor, that Windsor claims took place, actually occurred, Crawford surely would have advised the investigating officer. In this case, we believe that the conflicting testimony of Windsor and Crawford and the accident report of the investigating officer, all of which were offered by the moving party, created a genuine issue of material fact as to whether Windsor was an eyewitness to the accident.
¶ 29. It goes without saying that if Windsor was not a witness to the accident, his statements regarding the accident could not be based on personal knowledge. In the summary judgment context, the averments contained in a witness's affidavit must be based on the witness's personal knowledge. Otherwise, the affidavit has no probative value. M.R.C.P. 56(e); Daniels v. GNB, Inc., 629 So.2d 595, 599 (Miss. 1993).
¶ 30. Windsor's credibility problems pose a substantial hurdle for Crawford and Shippers Express. To this argument, the dissent quite correctly points out that "Windsor's potential credibility problems do not become evidence for the plaintiff." We readily agree, but they do become evidence against the movant in the summary judgment context, for, as stated, no probative value can be accorded his testimony if there is a genuine issue as to whether he is testifying from personal knowledge. It is a dispute over credibility, and all questions regarding a witness's credibility must be resolved by a jury, thereby precluding summary judgment. Leonard v. Dixie Well Serv. and Supply, Inc., 828 F.2d 291, 294 (5th Cir.1987).
¶ 31. Windsor's credibility problems notwithstanding, the ultimate issue is whether the taillights on the tractor trailer rig were functioning properly. As stated, Crawford and Shippers Express rely not only on the testimony of Windsor but also on the testimony of the driver, Crawford, and Operations Director Porch to support their contention that no genuine issue of material fact exists regarding the issue of the tail light. This reliance fails to accord proper weight to the circumstantial evidence offered by Quay on this issue.
¶ 32. Recall the testimony of McBroom who did repairs on the tractor just two days after the accident. He could not recall what repairs were done. He used six wire connectors and two feet of wire. What was he connecting? Why could he not remember which repairs were made? After all, these repairs were made just two or three days after the accident.
¶ 33. To say that McBroom's testimony does not give rise to probative circumstantial evidence which raises a genuine issue *84 of material fact regarding the question of whether the lights on the trailer were working properly is to ignore the fact that the trailer does not have a separate electrical system to power the trailer lights. All electrical power to the trailer is generated by the tractor and furnished to the trailer through electrical wires running from the tractor to the trailer. The fact that a witness says no repairs were made to lights on the trailer does not eliminate the fact question in the face of this evidence regarding repairs to the electrical system that powered all lights. Further more, if a defective wire was running from the tractor to the trailer that powered the trailer lights, it could be technically correct to say that no repair was made to the trailer lights, yet the trailer could be without lights because of the defective wire in the tractor. We thus conclude that the totality of Quay's evidence, along with the contradictions in the testimonies of Crawford and Windsor, raised genuine issues of material facts.

2. The Underride Guard
¶ 34. Quay offered the affidavits of two experts, John Eubanks and Douglas Bynum, in support of her contention that the underride guard was defective and that the defect resulted in the exacerbation of Lamson's injuries. Eubanks could not say whether the underride guard was broken prior to the accident or during the accident. However, in either case, it was his opinion that the guard did not comply with the Federal Motor Carrier's regulations because the welded guard was not firmly attached or substantially strong to withstand the impact. Bynum, an expert in the field of engineering, said that the prior weld of the underride guard had been done improperly, causing it to give way during the impact. He stated that the weld materials should have been stronger than the parent materials. According to Bynum, the improperly welded guard broke allowing Lamson's car to "pitch forward" and causing, as stated, Lamson's injuries to be exacerbated.
¶ 35. Crawford and Shippers Express admit that federal regulations require that the underride guard be "substantially constructed and firmly attached." However, they contend that the purpose of the underride guard is to "limit the distance that the striking vehicle's front end slides under the read end of the impacted vehicle." They then reason that because the passenger compartment of Lamson's vehicle was not compromised by the impact, the conclusion must be that the guard functioned properly, thus no negligence.
¶ 36. It strains reason to say unequivocally that the guard functioned properly even though it broke and allowed Lamson's car to proceed underneath the trailer. That the passenger compartment of Lamson's vehicle was not compromised in no way proves that the guard worked properly in light of the undisputed testimony that it broke during the collision or was already broken prior to the collision. While it is true that the top of Lamson's vehicle was not sheared off during the impact, that, however, may well have been due to the fact that the guard, though improperly maintained, did provide some protection. We cannot, however, conclude that an underride guard which provides some protection but breaks upon impact with a vehicle is the equivalent of a properly maintained underride guard.
¶ 37. To say that no genuine issue of material fact exists with respect to the maintenance of the underride guard under these circumstances simply because the top of Lamson's vehicle was not sheared off, is to overlook the fact that Shippers Express and Crawford had a duty to install and to maintain an underride guard *85 capable of preventing vehicles from traveling underneath the rear of the trailer in case of a rear-end collision. To hold that it is okay to have an underride guard that allows vehicles to travel beyond the guard and underneath the trailer as long as the top of the vehicle is not sheared off is nonsensical.
¶ 38. For the reasons set forth, we reverse and remand this case for a full hearing on the merits. It may be difficult for Quay to meet her burden of proof on remand, but that is not the standard for determining whether summary judgment was properly granted. Looking at all of the evidence in the light most favorable to Quay, we can see how a reasonable jury could conclude that the underride guard was defective and that the rear lights on the rear trailer of Crawford's rig were either dimly lit, functioning improperly or not at all.
¶ 39. THE JUDGMENT OF THE CIRCUIT COURT OF HINDS COUNTY GRANTING SUMMARY JUDGMENT IN FAVOR OF THE APPELLEES IS REVERSED AND THE CASE REMANDED FOR A FULL HEARING ON THE MERITS. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLEES.
KING, P.J., LEE, MYERS, PAYNE, JJ., concur. SOUTHWICK P.J., dissents with separate Opinion joined by McMILLIN, C.J., BRIDGES and THOMAS, JJ., CHANDLER, J., not participating.
SOUTHWICK, P.J., DISSENTING
¶ 40. The plaintiff had a theory but no evidence. In my view the majority rewards speculation, something the circuit court refused to do when it granted summary judgment. I would affirm.
¶ 41. This wrongful death suit alleged these items of negligence that are discussed in the majority opinion: (1) the rear trailer's lights were not functioning properly and (2) the trailer's rear underride bumper was improperly constructed or maintained. In a negligence action, the plaintiff bears the burden of producing evidence sufficient to establish the traditional elements of duty, breach of duty, proximate cause and injury. Therefore, when summary judgment is sought by the defendant, the court must determine whether the plaintiff has produced "supportive evidence of significant and probative value; this evidence must show that the defendant breached the established standard of care and that such breach was the proximate cause of her injury." Palmer v. Anderson Infirmary Benev. Ass'n., 656 So.2d 790, 794 (Miss.1995).

I. Fact question of functioning lights
¶ 42. Mr. Lamson's daughter asserts that there is an issue of material fact as to whether the rear lights on the Shippers Express trailer were working at the time of the collision. I first discuss the direct evidence regarding the lights, and then respond to the plaintiffs assertions that a fact dispute existed as to the issue.
¶ 43. There was testimony that the trailer's lights were on, visible and functioning properly before, immediately after and later in the day of the accident. Crawford, the driver of the truck, testified that he conducted a walk-around inspection just hours before the collision, and that the lights on the rear trailer were on and functioning properly. Glenn Porch, director of operations for Shippers Express, testified by affidavit that when he arrived at the scene after the accident, all of the lights on the rear trailer were working properly. He also stated that he followed behind the trailer as it was taken to *86 a garage in nearby Vaiden, and that the lights were still functioning then.
¶ 44. Officer Cotten, the investigating officer, testified by deposition that he could not recall whether the taillights of the second trailer were burning or not.
¶ 45. Additional evidence came from third-party eyewitness William Windsor, another truck driver who passed the Shippers Express tractor-trailer rig just before the accident, pulled off at a rest stop, and then came upon the accident as it was occurring. His deposition indicated that the lights on the tractor and trailers were on, visible and functioning properly. He stated that it is customary for truck drivers to note whether any lights are not functioning on other tractor-trailers when they pass them, so they can radio the driver and alert him to the problem.
¶ 46. The majority validly discusses the fact issue that arises concerning whether Windsor was actually an eyewitness, since other witnesses did not mention him. Of course, Windsor's potential credibility problems do not become evidence for the plaintiff. There still must be positive whether direct or circumstantialevidence to dispute that the taillights were functioning properly.
¶ 47. The majority addresses the overall evidence with several objections. Most basic perhaps is that the evidence from Glenn Porch and Archie Crawford, both of whom worked for the defendants, is called "self-serving" and therefore cannot be used during summary judgment. Cited for that proposition is one decision that contains this finding:
A factual dispute exists which precludes summary judgment in this case. Rochelle Moore made conclusory statements within her affidavit, to the effect that she gave "nursing treatment." This statement was self-serving, and cannot form the basis of summary judgment evidence.
Burton v. Choctaw County, 730 So.2d 1, 9 (Miss.1997). Whatever the Burton court meant, and it appears that the conclusory nature of the statement is the actual threshold for discounting the evidence, it did not overrule countless summary judgment decisions in which the evidence comes from the parties involved. Indeed, if a self-interest is grounds for rejecting evidence on summary judgment, then very little testimony would ever be usable. In this sense, affidavits of defendant employees are no more self-serving that the affidavit of expert witnesses employed by the plaintiffs. The nature of the employment may be different, but both sets of witnesses are interested.
¶ 48. Testimony from parties and their employees is not objectionable at trial because of their interests in the outcome. The only difference in the Rule 56 procedure is that after all the kind of evidence that is usable at trial is considered, the fact-finder cannot rule if there is a material dispute. What is specifically unusable is limited to "mere allegations or denials of his pleadings...." M.R.C.P. 56(f). There is no requirement that affidavits and other evidence only from disinterested witnesses can be considered in reaching that conclusion. Instead, this is the standard for evidence:
"To have power to generate a genuine issue of material fact," the "affidavit or otherwise" (e.g., depositions and answers to interrogatories) must: (1) be sworn; (2) be made upon personal knowledge; and (3) show that the party providing the factual evidence is competent to testify.
Magee v. Transcontinental Gas Pipe Line Corp., 551 So.2d 182, 186 (Miss.1989). The moving party as well as the responding one must use evidence that could be admitted *87 at trial. Crawford and Porch's testimony would not be objectionable at trial for being "self-serving," as that is not a question of admissibility but only of weight.
¶ 49. The Supreme Court recently dealt with an objection that the moving party's affidavits should not be considered because they were self-serving. After stating that affidavits were proper if they revealed admissible evidence, which includes evidence from someone competent to testify, the court then invoked a procedural problem with the self-serving issue. An objection that affidavits cannot be considered must be made in a motion to strike. Hare v. State, 733 So.2d 277, 284-85 (Miss.1999). The failure to make that motion, and no such motion was made here, waives the objection. Unless the previously mentioned Burton case silently and radically changed the law of summary judgment, all it means is that the specific affidavit there, which was characterized as conclusory as well as self-serving, could not be used to grant summary judgment.
¶ 50. The affidavits and depositions in this case meet these requirements and could be relied upon by the court. The evidence that must be disputed is the testimony by the driver Crawford, operations director Porch, and passer-by truck driver Windsor that the lights were working.
¶ 51. Credibility concerns do not create a fact issue; only contrary evidence does that. Whatever a jury might decide about credibility, positive evidence from someplace must exist on which to deny judgment. Thus even if Windsor and Crawford were not totally consistent in how they recounted the post-accident events, or even if suspicion exists about the truth of Windsor's statements, these do not create the dispute of material fact.
¶ 52. I now turn to the testimony from the people involved with the repairs and well as the repair records themselves. Most of that evidence indicates that nothing was done to the taillights on the trailer. Among the depositions were those of inspector Daniel Skinner and repairman William David Barrett. Neither of them recalled anything wrong with the taillights. A repair order from a few days after the accident states that it was necessary to "repair light"; parts numbers for wiring appear as well. But that was from the repair order for work to vehicle 2042. According to a witness, that was the tractor (i.e., the truck) and not the rear trailer whose lights are the issue here.
¶ 53. The rear trailer was vehicle 2712, which is the subject of later repair orders. If some lights on the tractor itself were not fully functioning, that does not raise a fact issue as to whether the lights at the rear of the trailer with which the deceased collided were inoperable. There is nothing in the record to discount the inevitable inference that even if a light on the tractor were malfunctioning, that would not affect someone approaching the back of a trailer on which the lights were working.
¶ 54. There is one piece of factual evidence left to analyze. A repair order from three months after the accident describes multiple repairs to the trailer. One item in the parts list for a certain day is a light bulb with a part number of 426R. Repairman Barrett who worked on the trailer that day stated that he had not worked on the rear lights. Skinner, who inspected the trailer for damage but did not work on the repairs, testified as to what different entries on the repair orders meant. He testified that part 426R is a taillight bulb. When asked whether that taillight bulb had been replaced, he began his answer by quoting the repair order:
Let's see. `Straighten bumper and reinforce.' Okay. That was probably right in here [apparently pointing to a photograph *88 of the trailer] somewhere, some repairs.
¶ 55. Nothing further was asked or answered about that bulb. The rear of the trailer was the point of impact, and thus the repairs were significant there. The person who conducted the repairs said that he had not worked on the taillights. Skinner had not observed the repairs and only stated that the repair order revealed that the bumper was straightened and reinforced.
¶ 56. This raises the problem of inferences upon inference. What the plaintiff seeks to create is evidence that prior to the collision, and as a proximate cause of it, the taillights on the trailer were not fully operational. The evidence that a bulb of the right kind for the rear taillight was on the parts list for repairs done on the trailer three months after the accident creates a reasonable inference that the person making the repairs found it desirable to replace one of the taillight bulbs on that date, but there is no evidence as to the reason. No one recalled replacing such a light, and even if it was done, there was no testimony that it was necessary because one of the rear lights had not been working at all prior to the repairs being commenced. Equally a possibility is that something done while straightening and reinforcing the bumper, repairs mentioned by the witness and shown on the repair order, made a new bulb necessary. Even if these inferences can be made, there must be an inference that the light had not been functioning three months earlier after the accident. And even if these inferences exist, the final inference must be considered beyond mere speculation that nothing occurred during the accident to dislodge or otherwise damage the light. Considering that the rear of the trailer received the entire impact of the collision, that last inference is the most unreliable of all. The passage of time and occurrence of many events between the moments before the accident in February and the need for a light bulb in May is what caused the trial judge to find the evidence in question not to create a fact issue.
¶ 57. The problem of inferences upon inferences has been addressed several times in our jurisprudence. Our Supreme Court has held that it is not necessarily fatal to the fact being alleged that it arises from one inference that depends on another inference. However, there are considerable limits on the sufficiency of such proof:
we must, in allowing inference upon inference, do so with the firm limitation that the probabilities thereby permitted to be entertained are safe and dependable probabilities, measured by legal standards, for they involve more than the simple and generally unimportant affairs of everyday life; they involve in court procedure the liberty and property of others. Obviously every inference drawn from another inference produces a result wherein the quality of probability becomes weaker and sooner or later a stage is reached when serious doubt arises whether, under legal standards, the ultimate inference in the chain of inferences is a legally safe and dependable probability or has become only a more or less strong possibility, and, when that stage is reached, the proof is insufficient, so far as concerns judgments at law.
Masonite Corporation v. Hill, 170 Miss. 158, 154 So. 295 (1934), quoted in Goodyear Tire & Rubber Co. v. Brashier, 298 So.2d 685, 688 (Miss.1974).
¶ 58. The "ultimate inference in the chain of inferences" that is necessary here is that a rear taillight was not working on the trailer prior to the collision. The chain to reach that inference begins with evidence *89 that three months after the accident and at the time that the rear of the trailer was being straightened and reinforced, one of the taillight bulbs was replaced. No link in the chain consists of evidence that a taillight ever did not workbefore the accident, immediately afterwards, or three months later. The ultimate inference of a malfunctioning taillight preceding the collision is a legally unsafe and undependable possibility, one no more likely than the opposite inference.
¶ 59. Taking this evidence and certain other points discussed below, John Eubanks, an expert witness employed by the plaintiff, stated the opinion that "the rear lights of the trailer in question were not in good working order" or perhaps were not operational at all. For that opinion to create a fact issue, there must be some evidence to support it. Otherwise, it is conclusory only and cannot prevent summary judgment. This means that when the evidence is lacking to support the necessary conclusion, obtaining an expert opinion does not substitute for evidence.
¶ 60. Eubanks based his opinion on five points. (1) There was no proof of the regular inspection of the trailer that should have occurred several months before the accident, and (2) there was inadequate written evidence of a pre-trip inspection by the driver though the driver testified he had conducted one. Neither of those bases does anything but increase the possibility that an inoperable taillight was overlooked prior to the accident. (3) There were wires hanging down by the taillights of the trailer, but there was no assertion that the wires were disconnected or even that they were part of the taillight assembly. (4) There was no reflector tape at the rear of the trailer, though there was no evidence that such tape was required by any regulation or statute. (5) Also relied upon were the repair records, but I have already discussed why they do not create a dispute of material fact that any of the taillights were inoperable.
¶ 61. At best Eubanks reveals doubts about the defense evidence. Had there been testimony or any other evidence, direct or circumstantial, that the lights were not working, then such doubts might have weighed on a fact-finder's mind at a trial as to whose version to believe. Instead, there is no opposing evidence to the statements that the lights were working.
¶ 62. A similar set of facts, with the same conclusion that insufficient evidence was presented to make a jury issue, arose in a Texas case. Willis Sears Trucking Company v. Pate, 452 S.W.2d 782 (Tex. Civ.App.1970). The court described the testimony of an investigating officer named Harris who arrived soon after one tractor-trailer collided with the rear of another:
Harris inspected the wiring on the trailer and found it was "loosely fitted. It was connected to the truck all the way down, and it had drops in it. There were places where it was tied or taped and places it had dropped several inches." Upon a test, the rear lights on the trailer could not be made to work, although the lights on the tractor performed satisfactorily. It is a fair summary of Harris' testimony that the wiring to the trailer was old, it was dirty, it looked like old wiring, and it was hanging loose in places. The wiring was connected to the main wiring in the tractor. The trailer had mud flaps with reflectors thereon but there was a road film over the reflectors. The reflectors were "not clean. They were not what you would call muddy, but they were dirty."
Id. at 787. The court found that there was "`perhaps, a glimmer of evidence to support plaintiffs' position' that the defendants' *90 truck was not lighted properly, `we think, and so hold' that it does no more than create a mere surmise or suspicion thereof." Id. at 788-89, (quoting Seideneck v. Cal Bayreuther Associates, 451 S.W.2d 752 (1970)). A distinction from our case is that the damage to the rear of the relevant trailer was apparently more severe than here. Offsetting that distinction is that in Pate there was direct evidence that the lights were not working immediately after the accident. Here, the evidence is an inference arising from events three months later.
¶ 63. I agree with the trial judge that there is nothing in the record to support that the trailer lights were off, or not visible or malfunctioning. Therefore, there are no material disputes of facts for a jury to resolve on the question of the lights on the trailer with which Mr. Lamson collided.

II. Genuine issues of material fact as to underride guard.
¶ 64. What is left then in the review of the summary judgment is whether there was evidence that defendants may have negligently caused an enhancement of the injuries that otherwise would have occurred and whether such negligence can be an independent basis for the defendants' liability. This issue has been called "crashworthiness," the "second accident doctrine," and the "enhanced injury" rule. It arises in product liability law as well as in traditional negligence suits. See Mary E. Murphy, Comparative negligence of driver as defense to enhanced injury, crashworthiness, or second collision claim, 69 A.L.R. 5th 625 (1999).
¶ 65. Mississippi has joined the trend of imposing liability on someone who had no causal responsibility for the initial accident but did contribute to the severity of injury. Toliver v. General Motors Corporation, 482 So.2d 213, 214 (1985)(products liability case). A different case with some similarities to our own involved a boating accident described by the court in this way:
Jimerson was pulling a water skier, when his son, who was also in the boat, yelled that they were about to hit someone. Immediately, Jimerson placed the motor in neutral. However, in that type motor, the propeller powering the boat continues to turn when in neutral. Appellant was hit by the boat and knocked under it, where he was then struck by the propeller and severely cut and injured.
Rose v. Mercury Marine, a Div. of Brunswick Corp., 483 So.2d 1351, 1352 (Miss. 1986). Suit was brought against the manufacturer of the motor, the seller of the boat, and the operator at the time of the accident. The court held that the possible safety hazard of not having the propeller stop when the motor was in neutral was a sufficient basis for suit to proceed against the manufacturer, even though the manufacturer was in no way responsible for the occurrence of the accident itself. Id.
¶ 66. Lamson's experts here supplied affidavits stating that the underride guard on the rear of the trailer was not properly maintained and did not meet federal guidelines. The affidavits asserted that this negligence exacerbated the injuries that Mr. Lamson otherwise would have suffered. John Eubanks, a motor carrier vehicle expert, inspected the underride guard after the accident and stated in his affidavit that the guard was broken either before the accident or broke during the accident when a welded area did not hold properly. Dr. Douglas Bynum, an accident reconstructionist and interdisciplinary engineer, stated in his affidavit that the welded underride guard broke because it was improperly welded. He also testified that because the guard failed, the Lamson *91 vehicle was pitched upward, causing more severe injuries than would have occurred had the guard not broken.
¶ 67. The trial judge was unpersuaded that this evidence was material. As the court viewed it, the extent of the defendants' duty was to have an underride guard that provided the protection for which it was intended. The trial court found that the purpose of the guard was to prevent a vehicle colliding with the rear of a trailer from sliding underneath and having the trailer intrude into the passenger compartment. Photographic evidence revealed that the passenger compartment of Lamson's vehicle never came in contact with the rear of the Shippers Express trailer and that the windshield pillars remained intact during and after the collision. Mississippi Highway Patrol Officer Harold Cotten, the investigating officer, also testified that the only intrusion into the passenger compartment came from particles of glass from the windshield.
¶ 68. The trial court concluded that the evidence proved without dispute that the guard served "its primary regulatory purpose" by preventing the underside of the trailer from impacting the passenger compartment of the Lamson vehicle. That conclusion supported the trial court's finding that negligence per se was not proven. Well and early expressing this negligence doctrine is the classic English tort case of Gorris v. Scott, L.R. 9 Ex. 125 (1874), discussed in PROSSER AND KEETON ON THE LAW OF TORTS 225 (1984), § 36. There a shipowner had failed to comply with a Privy Council order adopted under the Contagious Diseases (Animals) Act of 1869. That order required any ship bringing animals into England to comply with rules for segregating breeds and otherwise keeping the animals well penned. The purpose of the requirement was found to be inhibiting the spread of contagious diseases. The ship owner violated the order requiring the pens, which allegedly led to the plaintiffs sheep being washed overboard while at sea. The court found that "the damage complained of here is something totally apart from the object" of the statute, and consequently there was no liability. Gorris, 9 Ex. at 127-28.
¶ 69. Under Mississippi's interpretation of that doctrine, there is negligence as a matter of law in situations in which violation of a statutory standard is the proximate cause of injury, but only when the following is proved: the person injured is within the class intended to be protected by the statute, the harm suffered is of the kind that the statute is intended to prevent, and the statutory violation proximately caused his injuries. Snapp v. Harrison, 699 So.2d 567, 571 (Miss.1997).
¶ 70. No statute is relevant here. However, the supreme court on occasion has found that violation of a federal regulation can be negligence per se for purposes of a state court tort action. Mississippi Power & Light v. Lumpkin, 725 So.2d 721, 726 (Miss.1998). Whether the United States Department of Transportation rules for underride guards are of the type that should be similarly usable is a question that may be deferred unless it is first determined that the negligence per se doctrine otherwise applies. Accepting that others on the highway are among those intended to be protected by the guards, I attempt to determine the risks against which they guard.
¶ 71. The underride guard is required by federal regulations. 49 C.F.R. § 393.86. These "rear impact guard(s) must be substantially constructed and attached by means of bolts, welding or other comparable means." The explicit purpose of the requirement is stated to be the reduction of "the number of deaths and serious injuries that occur when light duty *92 vehicles collide with the rear end of trailers and semitrailers." 49 C.F.R. §§ 571.223 & 571.224. The plaintiff argues that the purpose of the underride guard is to protect against any injuries caused or exacerbated by a rear-end collision. She states that the "pitching action" caused when the bar allegedly broke on impact exacerbated Lamson's injuries and perhaps led to his death.
¶ 72. Just what harms were intended to be avoided by these guards was explored by the Supreme Court of Oregon. Hagan v. Gemstate Manufacturing, Inc., 328 Or. 535, 982 P.2d 1108 (1999). The court found that the plain wording of the statute was not sufficient to explain the extent of "rear end protection contemplated," nor did it discover any administrative interpretation of the regulation. Id.2d at 1114-15. The court then examined the history of the regulation. It discovered that the director of the Interstate Commerce Commission had in 1946 proposed that the Bumper Heights Committee of the Society of Automotive Engineers conduct research to determine whether regulations should be adopted to deal with underride. Id. at 1115. He described the problem of underride in this manner: "normal floor height of this type of equipment is such that a passenger car would ordinarily go under the floor and result in shearing off the top of the vehicle." Id. The committee recommended that any regulation promulgated by the Commission affect vehicles having a rear-end clearance of thirty inches or more from the ground, which the Commission adopted as the standard for the regulation in 1952. The regulation has never been amended. Id. at 1116.
¶ 73. The Oregon Supreme Court concluded that "the history of 49 CFR section 393.86 reveals that the regulation was promulgated to provide some protection against underride." Id. Underride, as described in the 1946 discussion of the regulation, results in "shearing off the top of the vehicle." Id. at 1115. It is that fact that caused the trial judge in the present case to find no dispute of material fact as to the underride guard. I find that intrusion into the passenger compartment is a variant of a complete shearing off of the top of the vehicle since it creates harm that is identical except as to degree. Therefore such intrusion also is within the category of harm that is to be avoided by the regulation. Since the passenger compartment of the vehicle was never invaded by the rear of the trailer, the underride guard satisfied the purpose of the regulation. The regulatory policy that creates the performance standard is limited in scope. When the harm that occurs is outside the defined risk as it was here, the negligence per se rules do not apply.
¶ 74. I do not address whether this regulation should be the basis for a negligence per se standard of liability. PROSSER AND KEETON, TORTS § 36 at 222-24 (not all statutes or regulations create civil liability standards). It is enough to say that the regulation does not support liability in the present case. As a result, the plaintiff would not have been entitled to a jury instruction that one or both defendants was negligent as a matter of law in the affixing of the guard.
¶ 75. The plaintiffs filings on summary judgment made it appear that negligence per se was the only argument that was made about the underride guard. In supplemental briefing that we requested on the issue, the plaintiff argues that the proper functioning of the tail-lights is the only negligence question in addition to whether the underride guard failed to meet the regulatory standard. I have already discussed that issue and found the plaintiffs proof lacking. I accept from the brief that whether the underride guard *93 violated the regulatory standard and whether the lights were working constitute the entire range of negligence issues that need to be analyzed.
¶ 76. I would affirm the trial court in all respects.
McMILLIN, C.J., BRIDGES and THOMAS, JJ., join this separate Opinion.
NOTES
[1] The dissent makes much of the fact that some of Quay's evidence in opposition to the motion for summary judgment involved the repairs made in May, some three months after the accident. However, there is nothing in the record to suggest that the repairs were the result of post-accident use of the trailer.