# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2007-CT-00750-SCT

*GREGORY S. DALTON, INDIVIDUALLY AND*
*d/b/a LOUISVILLE ELECTRONICS*

*v.*

*CELLULAR SOUTH, INC.*

## ON WRIT OF CERTIORARI

DATE OF JUDGMENT:                  04/04/2007
TRIAL JUDGE:                       HON. JOSEPH H. LOPER, JR.
COURT FROM WHICH APPEALED:         WINSTON COUNTY CIRCUIT COURT
ATTORNEYS FOR APPELLANTS:          WILLIAM LISTON
                                   DEWITT T. HICKS
                                   JOHN M. MONTGOMERY
                                   SARA ELAINE WOODRELL
ATTORNEYS FOR APPELLEE:            CHARLES LOUIS McBRIDE
                                   ANNE CLARKE SANDERS
                                   KATIE LOFTON WALLACE
NATURE OF THE CASE:                CIVIL - CONTRACT
DISPOSITION:                       AFFIRMED IN PART; REVERSED IN PART;
                                   AND REMANDED - 11/12/2009
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**EN BANC.**

**RANDOLPH, JUSTICE, FOR THE COURT:**

¶1.     This case involves the termination clause of an agency contract.  The issues are

whether the contract was ambiguous *vel non* and whether Cellular South, Inc. ("CSI") was

within its contractual rights to terminate its agency agreement with Gregory Dalton.  Dalton

submits that the Court of Appeals erred in affirming a grant of summary judgment in favor

of CSI. We agree. Dalton asks also that we reverse the denial of his motion for partial summary judgment. We decline. The judgments of the circuit court and the Court of Appeals are affirmed in part and reversed in part. We remand this case to the Winston County Circuit Court for proceedings consistent with this opinion.

## BACKGROUND

¶2.    Dalton was the owner of a Radio Shack store in Louisville, Mississippi. In April 1992, he entered into an agency agreement with Cellular Holding, a predecessor corporation of CSI. The original agreement was replaced on March 1, 1993, with a new Authorized Agent Agreement, which is the contract at dispute.[1] Under the agreement drafted by CSI,

---

[1]The relevant clauses of the contract follow:

3.1 Term: The term of the Agreement shall be one year, commencing on the date specified in Exhibit D of this Agreement [March 1, 1993], unless otherwise terminated or renewed pursuant to the provisions hereinafter provided. Cellular Holding is cognizant of the increasing value of the Agency relationship to a successful AGENT and therefore will *terminate a successful Agency relationship only if Cellular Holding determines that the continuation of the Agency relationship would be detrimental to the overall well being, reputation and goodwill of Cellular Holding.*
. . .
3.3 Renewal: This agreement shall be automatically renewed for one-year terms unless terminated as herein provided.
3.4 Default: In the event AGENT fails to perform any of its obligations under this Agreement and such failure continues unremedied for a period of thirty (30) days after written notice is given by Cellular Holding to AGENT, then Cellular Holding may thereupon elect to cancel and terminate this Agreement, which termination shall be effective immediately upon the expiration of said thirty-day period.
3.5 Termination: Either party may terminate this Agreement by giving the other party written notice of its desire to terminate at least thirty (30) days prior to the intended date of termination.

(Emphasis added.) An unnumbered paragraph follows clause 3.5. It begins, "Further, [CSI] shall have the right to terminate this Agreement upon written notice if: . . . ." It goes on to

2

Dalton was, *inter alia*, to procure cellular-phone customers for CSI in exchange for commission payments. The circuit court found that the agency relationship was beneficial to both parties, to wit:

> Dalton worked hard to help [CSI] establish a presence in the seven Mississippi counties covered by the Agreement. He helped [CSI] locate a site for a cellular tower in Louisville, Mississippi, and assisted it in obtaining the approval of the city government to re-zone the property so that a cellular tower could be erected there. Over the course of his relationship with [CSI], Dalton helped it gain over 6,000 customers. Dalton's hard work for [CSI] proved to be very rewarding to him as reflected by the 1099-MISC tax forms that were provided to him. In the form for 1999, it shows that Dalton was paid $81,970.30; for 2000, $127,740.00; for 2001, $172,095.00; for 2002, $183,380.00; and for 2003, $197,160.00.

The agency relationship lasted twelve years, during which Dalton operated a cellular-phone store in the same building as his Radio Shack store. Dalton was a nonexclusive agent in a seven-county area. CSI reserved the right to market its product through its own employees or other independent contractors.

¶3. In 1993, CSI instituted a policy concerning new agents. Beginning that year, all new agency contracts contained different provisions for termination. CSI removed the language in clause 3.1 requiring it to determine that it would be detrimental to continue an agency relationship. The new contracts were terminable at will. Six years later, CSI sent Dalton a new contract. Dalton refused to execute the new contract. The parties continued to operate under the March, 1, 1993, agreement. Subsequent to Dalton's 1999 refusal, payments by CSI increased significantly, more than doubling by 2003.

---

list several circumstances allowing for immediate termination. These include: agent making an assignment for the benefit of creditors, an order for relief for bankruptcy, appointment of a trustee, material misrepresentation or omission by the agent.

¶4.     In December 2003, CSI informed Dalton by letter that it was terminating the agency agreement. The stated reason for termination reads as follows: "This letter serves as notice to you under the Authorized Agent Agreement executed by you and [CSI] pursuant to a reorganization of [CSI]'s retail distribution plan, [CSI] is terminating its agent agreement with you effective February 6, 2004." Enclosed with the letter was a Full and Final Release, which Dalton refused to sign.[2] At the same time, CSI terminated ninety other agents in Mississippi. Only eight other agents had the 3.1 clause found in the Dalton contract. The remaining agents were terminated at will.

## LEGAL PROCEEDINGS

¶5.     After Dalton refused to sign the Full and Final Release, CSI filed a declaratory-judgment action in the Circuit Court of Winston County, seeking a judgment that it had complied with the agreement in terminating Dalton. CSI moved for summary judgment, asserting that the contract allowed it to terminate the agreement at will, as long as it gave Dalton thirty-days' notice. After Dalton filed a motion for partial summary judgment, CSI abandoned that position, claiming that it had made the determination that continuation of the contract would be detrimental to CSI, as provided in 3.1. Contemporaneously, CSI filed an affidavit from its president, Hu Meena. Meena cited the administrative burdens of maintaining the agency agreements, as well as the need for good customer service and

---

[2]The release contained the following language: "The Agency Agreement is terminable by either party without cause upon thirty days' written notice . . . . [CSI] has given proper notice to Agent of termination of the Agency Agreement without cause." The release also included: (1) a covenant not to sue, and (2) a release from the noncompete clause of the contract.

4

uniformity, before concluding that continuation would be "detrimental to the overall well being, reputation and goodwill of Cellular South." Meena's affidavit tracked the contractual language of 3.1 concerning termination. Thus, CSI acceded that 3.1 placed limitations upon its termination rights under 3.5. CSI then argued that it had complied with the requirements of 3.1 by referencing corporate reorganization in its December 2003 letter to Dalton. Dalton argued that 3.1 required CSI to determine that continuation of his contract was detrimental to CSI, and that CSI had not done so, and could not have done so, because of the success of his agency relationship with CSI. Dalton argued also that it would be error to grant summary judgment based on a self-serving, conclusory affidavit, which posited that CSI had complied with the contract terms. Further, Dalton argued that the terms of the contract had not been honored, as CSI admitted in the proceeding that the only stated basis for the termination, before litigation, was its reorganization plan.

¶6.     The circuit court found the contract to be unambiguous, and that there was only one reasonable interpretation regarding the parties' authority to terminate the contract: (1) Dalton could have terminated the contract at any time, with or without a reason, so long as he gave thirty-days' notice; (2) CSI could have terminated without prior notice for a reason listed in the unnumbered paragraph following clause 3.5 (see note 1), or after thirty days for a continued failure of Dalton to comply with a contract term; (3) however, because the second sentence of 3.1 limited CSI's right to terminate, absent any of the for-cause reasons in 3.4 and 3.5, CSI could terminate Dalton's "successful Agency relationship" only after thirty-days' notice to Dalton that CSI had determined that continuation "would be detrimental to the overall well being, reputation and goodwill of [CSI]"; (4) CSI was the sole arbiter of

5

whether continuation of the agency was detrimental. The court found no requirement that CSI determine that Dalton or his agency had caused the detriment, just that continuation had been determined by CSI to be detrimental. Thus, according to the trial court, CSI was contractually required, before terminating Dalton, to determine that continuation of the contract was to the detriment of its well-being, reputation, and goodwill.

¶7. After considering the Meena affidavit, the court then found that CSI had made the required determination. The court held that, viewing the evidence in the light most favorable to Dalton, no genuine issue of material fact existed as to whether the contract had been followed, and that CSI was entitled to a judgment as a matter of law. The circuit court granted CSI summary judgment, and denied Dalton's motion for partial summary judgment. A divided Court of Appeals affirmed the trial court. *See Dalton v. Cellular South, Inc.*, 2008 WL 4212553, at *5 (Miss. Ct. App. Sept. 16, 2008). Dalton's motion for rehearing was denied. This Court granted certiorari. *Dalton v. Cellular South, Inc.*, 12 So. 3d 531 (Miss. 2009).

## ISSUES

The issues are as follows:

I.    Whether it was error to find the contract unambiguous.

II.   Whether the circuit court erred in its summary judgment decisions.

## DISCUSSION

¶8. Our standard of review is de novo. For contract construction, the standard is:

"Questions concerning the construction of contracts are questions of law that are committed to the court rather than questions of fact committed to the fact

6

finder." We, as an appellate court, employ the de novo standard of review for questions of law.

***Facilities, Inc. v. Rogers-Usry Chevrolet, Inc.***, 908 So. 2d 107, 110 (Miss. 2005) (quoting

***Miss. State Highway Comm'n v. Patterson Enters., Ltd.***, 627 So. 2d 261, 263 (Miss. 1993)).

The standard for review of a summary judgment is likewise de novo:

> The circuit court's grant [or denial] of a motion for summary judgment is reviewed by this Court de novo. *See **Wilner v. White***, 929 So. 2d 315, 318 (Miss. 2006) . . . . In this Court's de novo review, "[t]he evidence must be viewed in the light most favorable to the party against whom the motion has been made." ***Daniels v. GNB, Inc.***, 629 So. 2d 595, 599 (Miss. 1993) (citation omitted).

***Kilhullen v. Kan. City S. Ry.***, 8 So. 3d 168, 174 (Miss. 2009).

¶9. Dalton first submits that the contract is unambiguous. Dalton next argues that the circuit court failed to use applicable contract-construction rules, and improperly used parol or extrinsic evidence, i.e., the Meena affidavit, in finding that the contract was unambiguous. Dalton maintains, alternatively, that if the Court finds the contract to be ambiguous, the ambiguous terms should, as a matter of law, be determined in his favor. CSI counters that the contract was properly construed and that Dalton's interpretation selectively adds and subtracts words from the contract.

## I. Whether it was error to find the contract unambiguous.

¶10. We find the contract clauses, standing alone, are unambiguous. Giving the words their plain and ordinary meaning does not generate an ambiguity. *See **Miss. Farm Bureau Cas. Ins. Co. v. Britt***, 826 So. 2d 1261, 1266 (Miss. 2002). However, when the clauses are read together, the clauses conflict. A conflict within the whole meets the very definition of ambiguity. "An ambiguity is defined as a susceptibility to two reasonable interpretations."

7

*Amer. Guarantee & Liability. Ins. Co. v. 1906 Co.*, 129 F.3d 802, 811-812 (5th Cir. 1997)

(citing *Ins. Co. of N. Amer. v. Deposit Guar. Nat'l Bank*, 258 So. 2d 798, 800 (Miss. 1972)).

A widely-quoted judicial definition of "ambiguous" is as follows:

> An "ambiguous" word or phrase is one capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.

*Walk-In Med. Ctrs., Inc. v. Breuer Capital Corp.*, 818 F.2d 260, 263 (2d Cir. 1987) (quoting

*Eskimo Pie Corp. v. Whitelawn Dairies, Inc.*, 284 F. Supp. 987, 994 (S.D.N.Y. 1968)). A

contract is ambiguous if it contains conflicting clauses when the contract is read as a whole.

This contract is capable of more than one reasonable interpretation as to when and how the

contract can be terminated. This contract fails to provide clear direction as to which

termination clause applies, without consideration of extrinsic evidence. Once a contract is

found to be ambiguous, resolution of any uncertainties will be against the drafter of the

contract. *See Pursue Energy Corp. v. Perkins*, 558 So. 2d 349, 352 (Miss. 1990).

¶11.     Courts may use a three-tiered approach to contract construction, if required. *See*

*Perkins*, 558 So. 2d at 351. The *Perkins* Court construed a deed, but this analysis has been

followed by this Court in the construction of various types of contracts. *See id.* at 350. *See*

*also One South, Inc. v. Hollowell*, 963 So. 2d 1156, 1158, 1162-63 (Miss. 2007) (lease);

*Gatlin v. Sanderson Farms, Inc.*, 953 So. 2d 220, 221-23 (Miss. 2007) (contract to grow

broiler chickens for processor); *HeartSouth, PLLC v. Boyd*, 865 So. 2d 1095, 1097, 1107-08

(Miss. 2003) (employment contract); *Royer Homes of Miss., Inc. v. Chandeleur Homes,*

*Inc.*, 857 So. 2d 748, 751-53 (Miss. 2003) (sales and distribution contract). In the first tier,

8

"the court will attempt to ascertain intent by examining the language contained within the 'four corners' of the instrument in dispute." ***Perkins***, 558 So. 2d at 352. The ***Perkins*** Court stated the following:

> In cases in which an instrument is not so clear ( *e.g.,* different provisions of the instrument seem inconsistent or contradictory), the court will, if possible, harmonize the provisions in accord with the parties' apparent intent. A cursory examination of the provisions may lead one to conclude that the instrument is irreconcilably repugnant; however, this may not be a valid conclusion. If examination solely of the language within the instrument's four corners does not yield a clear understanding of the parties' intent, the court will generally proceed to another tier in the three-tiered process. This entails discretionary implementation of applicable "canons" of contract construction. For example, one rule espoused by this Court suggests that uncertainties should be resolved against the party who prepared the instrument. Application of "canons" of construction may provide a court with an objective inference of the parties' intent. But if, at this step in the process, intent remains unascertainable ( *i.e.,* the instrument is still considered ambiguous), then the court may resort to a final tier in the three-tiered process of construction. This final tier entails consideration of extrinsic or parol evidence.

***Id.*** at 352-53 (internal citations omitted).

¶12.    The contract at issue contains termination clauses that lack clarity and that are not harmonious. Clause 3.1 calls for a one-year term and restricts the right of CSI to terminate the agreement as to "a successful AGENT" and "a successful Agency relationship." Clause 3.3 allows for automatic one-year renewals. Clause 3.5 allows either party to terminate at will. Clause 3.4 and the unnumbered paragraph following clause 3.5 allow CSI to terminate with cause under certain circumstances. Thus, reasonable minds could reach different conclusions after reading the whole contract, in discerning the intent of the parties, while giving effect to each separate clause. We find that the conflicts among the clauses create an ambiguity. ***Perkins*** establishes the next tier of canons of construction, i.e., resolution of

9

ambiguities shall disfavor the drafter of the instrument. *Id.* However, resolving the ambiguity to give Dalton the most favorable interpretation does not end the inquiry.

¶13. The language of the contract requires the use of parol or extrinsic evidence to determine if Dalton is eligible for 3.1 consideration, as 3.1 applies only to "a successful AGENT" with "a successful Agency relationship," which cannot be determined within the four corners of the contract. A court cannot complete the third tier of analysis without parol or extrinsic evidence. In the case sub judice, this evidence was provided by CSI, whose president attested, "Dalton's agency was a successful agency . . . ." However, that finding begs the question as to whether CSI terminated the contract for the reason it originally furnished to Dalton or whether CSI terminated the contract for the reasons offered after litigation began. That determination is a material fact and is in dispute. Whether CSI honored or breached the contract is a task for a jury, which leads us to Issue II. *See Royer Homes*, 857 So. 2d at 752 ("If the terms of a contract are subject to more than one reasonable interpretation, it is a question properly submitted to the jury."); *Burton v. Choctaw County*, 730 So. 2d 1, 9 (Miss. 1997).

**II.     Whether the circuit court erred in its summary judgment decisions.**

¶14. A conclusory, self-serving affidavit, unsupported by material facts relevant to the proposition at issue, is insufficient as a basis to grant summary judgment. *See Burton*, 730 So. 2d at 9 (Miss. 1997). *See also Hubbard v. Wansley*, 954 So. 2d 951, 965-66 (Miss. 2007); *Wallace v. Texas Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996). In *Burton*, a wrongful-death case involving a nursing home, "professional services," including "nursing

10

treatment," were contractually excluded from insurance coverage. *Burton*, 730 So. 2d at 5. A nurse's aide submitted an affidavit, in which she claimed that, in giving a bath to a nursing-home resident, she had provided "nursing treatment." *Id.* at 3. This Court, in a unanimous opinion, reversed the trial court by finding that the term "nursing treatment" was ambiguous, and that the affidavit, as a self-serving, conclusory statement, could not "form the basis of summary judgment evidence." *Id.* at 9. The *Burton* Court held further that, as the party moving for summary judgment, Choctaw County bore "the burden of persuading the trial court that no genuine issue of material fact exist[ed]." *Id.* at 4; *see Frank v. Dore*, 635 So. 2d 1369, 1373 (Miss. 1994). Here, the moving party, CSI, has the burden of production, persuasion and proof, as it would have the burden of proof at trial as the plaintiff in a declaratory judgment action. *See Calvert v. Griggs*, 992 So. 2d 627, 632 (Miss. 2008); 26 C.J.S. *Burden of Proof* § 145 pp. 243-44 (2001).

¶15.    The majority of cases illustrating this point of law involve the burden of summary-judgment nonmovants. *See Hubbard*, 954 So. 2d at 964; *Evan Johnson & Sons Constr., Inc. v. State*, 877 So. 2d 360, 365-66 (Miss. 2004); *Wallace*, 80 F.3d at 1047. In every case, before any burden falls to the nonmovant, the party moving for summary judgment first must have met its burden under Mississippi Rule of Civil Procedure 56. *See Van v. Grand Casinos of Miss., Inc.*, 767 So. 2d 1014, 1017-18 (Miss. 2000) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986)). Our disdain for conclusory, self-serving affidavits applies equally to summary-judgment movants and nonmovants, especially considering our requirement to view the evidence in the light most favorable to the nonmovant. *See Daniels*, 629 So. 2d at 599.

11

¶16.    In *Hubbard*, the plaintiff's expert submitted multiple affidavits, the second of which was found to be conclusory in an effort to cure contradictory deposition testimony. *Hubbard*, 954 So. 2d at 965-66 ("affidavits which are 'almost wholly conclusory' are 'less than satisfactory'") (quoting *Walker v. Skiwski*, 529 So. 2d 184, 187 n.2 (Miss. 1988)). Further, the *Hubbard* Court found that the affidavit contained "'magical' language" without "real facts to back it up." *Hubbard*, 954 So. 2d at 965. This is not unlike CSI's tracking of contractual language in the affidavit to shore up its new position. CSI's conclusory affidavit was offered without foundation in fact as to how, when, and why CSI determined that continuation of the contract was detrimental to its well-being, reputation, and goodwill.

¶17.    The relevant portions (paragraphs 5-8) of the Meena affidavit are as follows:

> Mr. Dalton's was one of approximately ninety (90) agency relationships terminated by [CSI] at my direction in late 2003 and early 2004. [CSI]'s decision to discontinue the use of independent agents was in large part due to the administrative burdens that it had experienced in managing independent agents throughout its service area. These administrative burdens included assigning a dedicated management employee to oversee the agents, keeping up with commissions earned by the agents, which did not vest until the customer had remained with [CSI] for a pre-determined period of time, and insuring that agents were marketing [CSI]'s service in a manner consistent with [CSI]'s corporate marketing strategy.

> At or about the same time that I made the decision to terminate the independent agents used by [CSI], [CSI]'s own network of company-owned retail stores had become sufficient to perform its necessary retail functions.

> [CSI]'s reputation for good customer service and the uniformity of the customers' experiences in dealing with [CSI], regardless of whether they contact [CSI] by visiting its stores, calling on the telephone or using the [CSI] website, are critical to [CSI]'s ability to maintain and grow its customer base. At the time I made the decision to terminate the use of agents, I believed and still do believe that [CSI] is better able to maintain its overall customer service standards without the use of independent agents.

To the best of [CSI]'s and my knowledge, Dalton's agency was a "successful" agency in terms of sales. However, it was impractical for CSI to maintain some agents while terminating others, since the administrative burden of maintaining a few agents would have been very similar to the burden of maintaining them all. For these reasons, I determined that continuation of [CSI]'s agency relationships, including Dalton's, would be detrimental to the overall well-being, reputation and goodwill of [CSI].

*Dalton*, 2008 WL 4212553, at *7. The affidavit posits Meena's belief that continuation would be "detrimental to the overall well being, reputation and goodwill of [CSI]." The claimed administrative burdens, if any, might or might not affect CSI's financial well-being, but we discern no evidence of detriment to CSI's reputation and good will, as the contract requires.

¶18. We find that CSI failed to satisfy the requirements for the grant of summary judgment, as it provided only a conclusory, self-serving affidavit in support thereof. Given our summary-judgment standard of review, we decline to affirm summary judgment in favor of CSI. Likewise, concerning Dalton's motion for partial summary judgment, we find it wanting for similar reasons. Dalton has failed to show the lack of a genuine issue of material fact and that he is entitled to judgment as a matter of law.

## CONCLUSION

¶19. The contract is ambiguous. Summary judgment should not have been granted to either party. Therefore, we (1) reverse the grant of summary judgment to CSI; (2) affirm the denial of partial summary judgment to Dalton; and (3) remand for proceedings consistent with this opinion.

¶20. **THE JUDGMENTS OF THE COURT OF APPEALS AND THE CIRCUIT COURT ARE AFFIRMED IN PART, AND REVERSED IN PART. THIS CASE IS**

13

**REMANDED TO THE CIRCUIT COURT OF WINSTON COUNTY FOR PROCEEDINGS CONSISTENT WITH THIS OPINION.**

   **WALLER, C.J., CARLSON AND GRAVES, P.JJ., DICKINSON, LAMAR, KITCHENS, AND PIERCE, JJ., CONCUR. CHANDLER, J., NOT PARTICIPATING.**