IRVING, P.J.,
dissenting:
¶ 32. The majority, finding that the trial court was correct that the statute of limitations had run on Evans’s legal-negligence claim, affirms the trial court’s grant of summary judgment to Howell. With due respect, I believe that the majority errs, as, based on the evidence presented for and against summary judgment, there is a genuine issue of fact as to when Evans knew or should have known of Howell’s negligence. Therefore, I dissent. I would reverse and remand this case for further *926 proceedings. Although the majority has set forth most of the essential facts, I find it helpful to an easy read of this dissent to recite them in a slightly different order.
¶ 33. Evans and Giordano were the sole stockholders of EGI, a Mississippi corporation. Each owned a fifty percent interest of stock in EGI. Howell performed a variety of legal services for Evans and Giordano regarding EGI, which included setting up the corporation, drafting corporate documents, and advising Evans and Giordano on various corporate and other legal issues.
¶ 34. On August 16, 1996, Howell drafted a “Purchase and Sale Agreement” (the 1996 agreement) for Evans and Giordano, which both Evans and Giordano signed. The purpose of this agreement was to allow the surviving stockholder to purchase the deceased stockholder’s interest in EGI and to provide for the purchase of life insurance to fund the purchase of the deceased stockholder’s interest. Although Evans and Giordano owned two additional companies in 1996, SRS and IPS, the 1996 agreement only applied to EGI. Each share of EGI was worth $1,500. The 1996 agreement valued all EGI stock at $1,500,000.
¶ 35. Between 1996 and 2004, Evans and Giordano formed two additional corporations, INS and EGF. INS, EGF, SRS, and IPS operated as EGI’s sister companies. By 2004, the sister companies were gaining success and bringing in significant income and profits. As a result, in September 2004, Giordano requested that Howell draft a new agreement (the 2004 agreement) which would allow the surviving stockholder to purchase the deceased stockholder’s interest in all five companies for $3,000,000. The 2004 agreement stipulated that the surviving stockholder would purchase the deceased stockholder’s interest in all five companies using the life insurance proceeds.
¶ 36. Evans and Giordano never executed the 2004 agreement due to ongoing negotiations unrelated to the valuation of the corporations set forth in the 2004 agreement. According to Evans, the negotiations involved Giordano’s prospective purchase of Evans’s interest in all of their companies. Evans and Giordano asked Howell to draft a third agreement in March 2005 (the 2005 agreement) because they would not execute the 2004 agreement until they resolved the prospective buyout. The 2005 agreement reads: “The parties to the buy/sell agreement of 1996 agree that, pending completion of a new agreement, the prior business valuation is hereby increased to three million dollars, with life insurance policies currently in place in that amount.” Evans and Giorda-no executed the 2005 agreement.
¶ 37. Giordano died on May 25, 2006. Evans received the $3,000,000 life insurance death benefits. Giordano’s estate filed suit against Evans in the Madison County Circuit Court, taking the position that the $3,000,000 from Giordano’s life insurance policy was for the purchase of Giordano’s EGI stock only, not Giordano’s interest in the sister companies. Evans, on the other hand, contended that the insurance proceeds covered not only Gior-dano’s interest in EGI, but also Giordano’s interest in the other four corporations identified in the 2004 agreement. Nevertheless, Evans settled with the estate, paying more than the $3,000,000 that he received in life insurance proceeds. On May 13, 2009, Evans filed his complaint for legal malpractice, alleging that Howell negligently failed to prepare the 2005 agreement to cover all corporate entities formed by Evans and Giordano.
¶ 38. The linchpin of the majority’s decision to affirm is its view that Evans, as *927 well as any layman of average intelligence, would understand that the 2005 agreement refers to EGI and that Evans should have understood that the agreement references the valuation of EGI only, changing it from $1,500,00 to $3,000,000. As a consequence, the majority finds that the statute of limitations began to run on March 10, 2005, the day Evans executed the 2005 agreement. I will attempt to explain later in this dissent why I disagree with the majority's position. But I should note at this point that the commencement of the running of a statute of limitations imposes upon an injured party the obligation to commence suit for the redress of the injury suffered or risk being forever barred from doing so. The majority does not explain any injury that Evans suffered in March 2005 immediately upon his signing the agreement that would have allowed him to sue Howell for damages.
¶ 39. Next, I should point out that what Evans knew or should have known about the 2005 agreement cannot be viewed in a vacuum by a simple reading of the words in the agreement. Rather, knowledge imputed to him must be considered in light of the history between him and Giordano in valuating their businesses and providing capital for the survivor to utilize in the purchase of the other’s interest in case of death. Their first venture in this direction involved one corporation — EGI—and then in 2004, all five corporations. When considered against the backdrop of this historical perspective, I believe the 2005 agreement, despite its brevity, is clearly ambiguous.
¶ 40. What must not be lost in the analysis is that, prior to the drafting of the 2005 agreement, Howell had drafted not only a 1996 agreement, admittedly involving only EGI, which was valued at $1,500,000, with each partner owning a one-half interest, but he also had drafted a 2004 agreement involving all five corporations, valued in the aggregate at $6,000,000, with each partner owning a one-half interest. Evans and Giordano’s objective in making the initial purchase of $1,500,000 in insurance in 1996 was to provide capital for the surviving partner to purchase the deceased partner’s interest in EGI, the only profitable corporation at that time. Later, after two other corporations had been formed, making a total of five with the three that were in existence when the 1996 agreement was executed, Evans and Giordano increased their life insurance policies to $3,000,000 each and provided in the 2004 agreement that the surviving partner could purchase the deceased partner’s interest in all five corporations for $3,000,000. It is clear to me that the objective that Evans and Giordano were attempting to accomplish in both the 1996 and 2004 agreements was to establish a fair value of the deceased partner’s interest in their jointly owned corporations and to provide a funding mechanism that the surviving partner could use to purchase the deceased partner’s interest. In 1996, Evans and Giordano had one profitable corporation, EGI. By 2004, they had five. Therefore, in furtherance of their objective that began in 1996, they purchased additional insurance, valued all five corporations at $6,000,000, and provided that the surviving partner could purchase the deceased partner’s interest in all five for $3,000,000.
¶ 41. It is of no moment that the 2004 agreement was not signed, as there is no disagreement that the valuation of all five corporations provided for in the 2004 agreement was what the parties intended. Its value to the resolution of the issue before us lies in the fact that Evans and Giordano had agreed upon a value of all five corporations prior to the execution of the 2005 agreement. Further, there is no dispute that the only reason Evans and *928 Giordano did not sign the 2004 agreement is that Giordano was attempting a buyout of Evans’s interest in all five corporations. It is also not disputed that the buyout negotiations were not stalled over the aggregate value of the corporations. Additionally, there is no evidence or suggestion that Giordano was negotiating the purchase of EGI only. Therefore, when the parties asked Howell to draft the temporary agreement in 2005, it is entirely reasonable that their intention was to make sure that the surviving partner would be able to acquire the deceased partner’s interest in all five corporations for $3,000,000 if either of the partners died before the buyout of Evans’s interest was completed. It is also reasonable for Evans to believe that execution of the 2005 agreement had accomplished that objective.
¶ 42. Mississippi Code Annotated section 15-1-49 (Rev.2003) requires that a legal malpractice action be brought within three years after the cause of action has accrued. The statute of limitations begins to run on the date that the client learns or, through the exercise of reasonable diligence, should learn of his lawyer’s negligence. Smith v. Sneed, 638 So.2d 1252, 1256 (Miss.1994). The Mississippi Supreme Court has held that the client learns of the negligence “as soon as an injury is sustained as a result of a defendant’s alleged culpable conduct.” Id. at 1254-55. Therefore, it follows that if no injury has occurred, the client cannot be charged with knowledge of the lawyer’s negligence.
¶ 43. I agree with Evans that a genuine issue of material fact exists as to whether Evans knew or should have known of Howell’s negligence prior to Giordano’s estate raising the issue with the agreement. Pri- or to that time, Evans had not suffered any injury, nor had he been placed on notice of any potential negligence on the part of Howell. Evans was first placed on notice when Giordano’s estate balked at accepting $3,000,000 for Giordano’s interest in all five corporations. It is not debatable that the injury occurred in March 2007, when Evans was forced to pay more than $3,000,000 to acquire all of Giordano’s interest in all five of the corporations.
¶ 44. Our supreme court has held that when “it is unrealistic to expect a layman to perceive the injury at the time of the wrongful act[,]” the discovery rule applies, tolling the statute of limitations for legal malpractice. Channel, 954 So.2d at 421 (¶ 19) (citations omitted). Although Howell may have committed legal malpractice in March 2005 when he drafted the 2005 agreement, the statute of limitations did not begin to run until Evans had knowledge or, through the exercise of reasonable diligence, should have known of Howell’s negligence. As a layman, Evans could not be charged in March 2005 with knowing, without hiring another attorney to review Howell’s work product, that the 2005 agreement that Howell had drafted was inadequate to accomplish Evans and Gior-dano’s intended objective. In Channel, our supreme court, while discussing its holding in Sneed, explained why reasonable diligence does not require such a course of action:
[I]f the discovery rule were not followed, the client could protect himself fully only by ascertaining malpractice at the moment of its incidence. To do so, he would have to hire a second attorney to observe the work of the first. This costly and impractical solution would but serve to undermine the confidential relationship between attorney and client.
Channel, 954 So.2d at 422 (¶ 21).
¶45. “An ambiguity is defined as a susceptibility to two reasonable interpretations.” Dalton v. Cellular S., Inc., 20 So.3d 1227, 1232 (¶ 10) (Miss.2009) (citing *929 Amer. Guar. & Liab. Ins. Co. v. 1906 Co., 129 F.3d 802, 811-12 (5th Cir.1997)). As stated, the majority agrees with the trial judge that the 2005 agreement is clear and unambiguous in that the alleged misrepresentation is apparent on the face of the 2005 agreement. In my judgment, one could reach this conclusion only by reading the 2005 agreement in a vacuum. The “prior business valuation” language in the 2005 agreement does not specifically refer to either the 1996 valuation of EGI or the 2004 valuation, which included the total valuation of all of the corporations. The reference in the 2005 agreement to the 1996 agreement is a reference to the parties, not to the 1996 valuation. Even though the 2004 agreement was not executed, it is not unreasonable for a layperson to interpret the “prior business valuation” language in the 2005 agreement to be a reference to the $3,000,000 valuation contained in the 2004 agreement, which covered all of the businesses that Evans and Giordano owned in 2004. This is especially true since the 2004 agreement stipulated that the surviving stockholder would purchase the deceased stockholder’s interest in all five companies using the life-insurance proceeds, which at that time were $3,000,000. Therefore, the agreement could be read as Giordano’s estate read it — to cover only the purchase of Giorda-no’s interest in EGI — or it could be read to cover the purchase of Giordano’s interest in all five companies, as stipulated in the 2004 agreement.
¶ 46. For the reasons presented, I dissent.
LEE, C.J., ROBERTS AND MAXWELL, JJ., JOIN THIS OPINION.