# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2014-CA-01306-COA

**SIMON F. WEIR, II, AND SARAH B. WEIR**       **APPELLANTS**

**v.**

**CRYE-LEIKE OF MISSISSIPPI, INC.**       **APPELLEE**

DATE OF JUDGMENT:        07/17/2014
TRIAL JUDGE:        HON. JAMES MCCLURE III
COURT FROM WHICH APPEALED:        DESOTO COUNTY CIRCUIT COURT
ATTORNEYS FOR APPELLANTS:        HUGH H. ARMISTEAD
       JASON WILTON BAILEY
ATTORNEY FOR APPELLEE:        TODD BRITTON MURRAH
NATURE OF THE CASE:        CIVIL - CONTRACT
TRIAL COURT DISPOSITION:        SUMMARY JUDGMENT GRANTED IN
       FAVOR OF APPELLEE
DISPOSITION:        AFFIRMED: 11/10/2015
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE IRVING, P.J., MAXWELL AND FAIR, JJ.**

**FAIR, J., FOR THE COURT:**

¶1. In a breach-of-contract case in the DeSoto County County Court, Crye-Leike of Mississippi Inc. moved for summary judgment against Simon and Sarah Weir. The county court granted Crye-Leike's motion. The Weirs then appealed to the DeSoto County Circuit Court, and it affirmed the county court's grant of summary judgment. The Weirs appealed to this Court. Finding no error, we affirm.

## FACTS

¶2. In July, 2011, the Weirs had their home for sale by owner. Clare Maness, a real-estate agent at Crye-Leike, had a client – John Scallions – interested in the Weirs' home. Maness

called Simon and asked if she could show the house to her client. Simon agreed. Maness showed the house to Scallions that same day.

¶3. The Weirs then entered into an "Agreement to Show Unlisted Property" with Maness. Under the agreement, the Weirs allowed Maness, as a Crye-Leike affiliated licensee, to show the Weirs' real property for potential sale to Scallions. The agreement provided for payment of a commission of 3% of the sales price upon the sellers and the buyer entering into a Purchase and Sale Agreement. The contract specifically provided that "[s]hould Owner(s)/Seller default in any purchase and sale or transfer agreement to Purchaser(s), the commission shall remain due."

¶4. The following day, Scallions offered to purchase the Weirs' home for $268,900. Maness drafted a Purchase and Sale Agreement for Scallions that included several contingencies. In particular, the contract was contingent upon the appraised value of the house meeting or exceeding the agreed purchase price. Scallions signed the agreement. After reviewing Scallions's offer, the Weirs tendered to him a signed counter-offer of $269,900. Scallions accepted and signed off on the counter-offer on July 18, 2011.

¶5. On July 20, 2011, a couple of days after the home inspection, Simon called Maness. He was upset that he had not received a list of requested repairs from Scallions. Maness said that Scallions would be leaving his work at 4:30 p.m. and that he wanted to speak with the pool inspector before putting together the punch list. Simon got angry and hung up the telephone.

2

¶6.     Simon called Maness back later that day and told her that Sarah was not happy about the pending sale.  He also said Sarah was having some "hormonal" issues, and they probably could not go through with selling their home.  Maness explained that it was her job to keep the deal together.  She also said that the offer from Scallions was a very good offer, considering that the Weirs had received no other offers after twenty previous showings.  Maness then told Simon that she would talk to Scallions after he left work and would put together the list of requested repairs.  Maness also told Simon that she would help them find a rental house to transition from their current home to their new home.  Simon called Maness back again that same day and told her that there was no way that he and Sarah would go through with selling the house.  Simon offered to speak directly with Scallions, but he declined.

¶7.     Maness delivered the list of requested repairs to the Weirs later that day, on July 20, 2011.  The next day, Maness received an email from Simon restating that he was rescinding the sales contract.  Maness advised both the Weirs and Scallions to seek legal counsel.  Scallions hired an attorney and decided to proceed with closing.  The Weirs also hired an attorney, who contacted Maness and said he was trying to resolve the issue.  According to Maness, he reassured her that she would receive her commission and asked how much it would take to "buy Scallions out" of the Purchase and Sale Agreement.

¶8.     On or about July 25, 2011, Maness received an email from the Weirs' attorney that contained an addendum to the sales contract on the subject property.  The addendum

3

amended the sales contract as to repairs, providing a credit to Scallions of $1,000 towards repairs at closing. The addendum further extended the closing date to August 17, 2011, and the date of possession to August 19, 2011, at 5 p.m. Scallions accepted the addendum. Maness reminded the Weirs' attorney that the Weirs still needed to provide a termite letter under the terms of the sales agreement. He told Maness that his client would not provide a termite report until the appraisal was complete.

¶9.    Scallions obtained the appraisal. The house appraised for approximately $264,000 (about $6,000 less than the purchase price). Iberia Bank handled the purchase money loan for Scallions, to be in a percentage amount of the appraisal. Sometime before August 3, 2011, the Bank informed Scallions that the house had appraised for approximately $6,000 less than the purchase price. Scallions told the Bank he still wanted to proceed with closing and that he would provide extra cash at closing to adjust his down payment upward to allow for a slightly lesser loan amount. The Bank agreed.

¶10.    During the appraisal process, the Weirs' attorney contacted Maness several times. He reiterated that his client would not go through with the purchase or provide a termite report without first seeing the appraisal. The Bank contacted the Weirs' attorney and said it was fully prepared to fund the loan and that closing could proceed. But he insisted that his client would not go forward with the sale until the appraisal was disclosed to him and his client. So Scallions provided the Weirs with the appraisal and a copy of his letter to the Bank, stating that he would make up the difference between the appraisal and the purchase price

with extra cash at closing.

¶11. On or about August 3, 2011, the Weirs' attorney refused to go through with the sale of the property, stating that he believed that his client could rely on the appraisal contingency to nullify the contract. A few weeks later, Scallions informed Maness that he had settled with the Weirs for their breach of the Purchase and Sale Agreement. The settlement provided that the Weirs pay Scallions a sum of $522.50, and return his $1,000 earnest money deposit, for a total cash settlement of $1,522.50, for which he would release any and all of his claims related to the purchase contract.

¶12. The Weirs refused to pay Maness since the sale did not go through. Crye-Leike sued the Weirs, claiming that Maness was entitled a commission under the terms of the Agreement to Show Unlisted Property. The county court granted summary judgement in favor of Crye-Leike, and the circuit court affirmed on appeal. The Weirs appeal.

## STANDARD OF REVIEW

¶13. This Court reviews the grant of summary judgment de novo. *Sweet v. TCI MS Inc.*, 47 So. 3d 89, 91 (¶9) (Miss. 2010) (citing *In re Estate of Laughter*, 23 So. 3d 1055, 1060 (¶17) (Miss. 2009)). Summary judgment is proper when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." M.R.C.P. 56(c). "The evidence must be considered in the light most favorable to the party against whom the motion is made." *Sweet*, 47 So. 3d at 91 (¶9).

**DISCUSSION**

¶14. This case involves two separate contracts: The Agreement to Show Unlisted Property (entered into between Maness and the Weirs), and the Purchase and Sale Agreement (entered into between Scallions and the Weirs). On appeal, the Weirs argue that the circuit court erred in affirming the grant of summary judgment based on the terms of the Purchase and Sale Agreement.

¶15. The interpretation of a contract requires that a court employ a three-part analysis:

First, [the court] look[s] to the "four corners" of the agreement and review[s] the actual language the parties used in their agreement. When the language of the contract is clear or unambiguous, [the court] must effectuate the parties' intent. However, if the language of the contract is not so clear, [the court] will, if possible, harmonize the provisions in accord with the parties' apparent intent. Next, if the parties' intent remains uncertain, [the court] may discretionarily employ canons of contract construction. Finally, [the court] may also consider parol or extrinsic evidence if necessary.

*Cypress Springs LLC v. Charles Donald Pulpwood Inc.*, 161 So. 3d 1100, 1103-04 (¶10) (Miss. Ct. App. 2015) (quoting *Chapel Hill LLC v. SoilTech Consultants Inc.*, 112 So. 3d 1097, 1099 (¶10) (Miss. Ct. App. 2013)).

¶16. In *Epperson v. SOUTHBank*, 93 So. 3d 10, 17 (¶20) (Miss. 2012), the supreme court held:

In a summary judgment case, the reviewing Court need not go through the entire three-step analysis; the Court should determine only whether the contract is ambiguous. Questions of contract construction and ambiguity are "questions of law that are committed to the court rather than questions of fact committed to the fact[-]finder." If the reviewing Court finds the terms of the contract to be ambiguous or subject to more than one interpretation, the case must be submitted to the trier of fact, and summary judgment is not

6

appropriate.

(Internal citations omitted).

¶17.    "[C]lear and unambiguous contracts must be given their plain meaning." *Fid. & Guar. Ins. Co. v. Blount*, 63 So. 3d 453, 465 (¶44) (Miss. 2011).  When determining whether a contract is ambiguous, the Court must review the express wording of the contract as a whole.  *Cherokee Ins. Co. v. Babin*, 37 So. 3d 45, 48  (¶8) (Miss. 2010) (citations omitted). "The mere fact that the parties disagree about the meaning of a provision of a contract does not make the contract ambiguous as a matter of law." *Delta Pride Catfish Inc. v. Home Ins. Co.*, 697 So. 2d 400, 404 (Miss. 1997) (quoting *Cherry v. Anthony, Gibbs, Sage*, 501 So. 2d 416, 419 (Miss. 1987)).

### 1.  Agreement to Show Unlisted Property

¶18.    Although the Weirs' appeal focuses on the Purchase and Sale Agreement, the relationship of the parties is contained in their Agreement to Show Unlisted Property with Maness.  That contract, and not the Purchase and Sale Agreement, deals with the terms for Maness's commission.  Both the county and circuit courts found that the Agreement to Show Unlisted Property was unambiguous and solely determined Maness's entitlement to a commission. That contract states, in relevant part:

> Should Owner(s)/Seller(s) accept an offer to sell or transfer Real Property Purchaser(s), Owner(s)/Seller(s) agree to pay Crye-Leike a commission of 3% of the agreed upon sales price or value of the transfer, whichever is applicable to the transaction, plus $195.  Said commission payment may be delayed until closing.  *Should Owner(s)/Seller default in any purchase and sale or transfer agreement to Purchaser(s), the commission shall remain due.*  Owner/Seller

7

shall pay Crye-Leike all reasonable costs plus an attorney fee in the amount of one-third of the commission in the event legal action is instituted to recover the commission.

(Emphasis added).

¶19.   "The general rule of brokerage contracts is that when a principal and a broker enter into a contract and the contract 'specifies the price and terms of sale, the agent performs his duty, and is entitled to a commission, when he procures a purchaser ready, willing and able to buy, even though the owner may then decline to sell.'" *Hamilton v. Hopkins*, 834 So. 2d 695, 701 (¶20) (Miss. 2003) (citing *Varner Real Estate Inc. v. Bobb*, 491 So. 2d 528, 529 (Miss. 1986)).   Here, the terms of the Agreement to Show Unlisted Property are clear. Maness fulfilled her obligation under the contract when she secured a purchaser for the Weirs, and the Weirs accepted the purchaser's offer.  Further, the contract specifically states that, if the Weirs default, Maness is still entitled to her 3% commission.

¶20.   We find that the circuit court correctly held that the Agreement to Show Unlisted Property is unambiguous.  We also find that this contract alone is sufficient to show that no genuine issue of material fact exists as to whether Maness is entitled a commission, and therefore, summary judgment was proper.

**2. Purchase and Sale Agreement**

¶21.   The Purchase and Sale Agreement is irrelevant as to whether Maness is entitled her commission.  But because the Weirs' appeal focuses on the Purchase and Sale Agreement (specifically the appraisal contingency), we will address their argument.  The Weirs claim

8

that the Agreement to Show Unlisted Property was contingent on the Purchase and Sale Agreement. And because the house appraised for less than its value, they submit they were not required to proceed under either contract. Crye-Leike argues that the appraisal contingency was included to protect the buyer, not the seller, so the Weirs cannot use the contingency as a means to avoid paying Maness her commission.

¶22. The Purchase and Sale Agreement was essentially a drafted "offer" to be accepted or counter-offered by the Weirs. They had two main duties under the final draft – to accept the purchase price (less $1,000 for repairs) and sign instruments necessary to convey ownership to Scallions. In the contract, Scallions had provided for several contingencies, such as (1) a list of items to be included in the property; (2) his ability to obtain a fixed rate loan or conventional loan; (3) a satisfactory home inspection; (4) a satisfactory termite inspection; and (5) the home's appraised value either equaling or exceeding the purchase price. Under the plain language of the contract, both parties agreed to the sale of property in the amount of $269,900. Scallions was prepared to pay the $269,900, regardless of the low appraisal.

¶23. In reviewing the "express wording of the contract . . . as a whole," it is obvious the contingencies existed to protect the buyer. *Cherokee Ins. Co.*, 37 So. 3d at 48 (¶8). "[I]t is simple contract law that a party may waive the protections of any provision of a contract." *Sanderson Farms Inc. v. Gatlin*, 848 So. 2d 828, 837 (¶23) (Miss. 2003). When Scallions waived the appraisal contingency, and the Weirs refused to proceed, they breached the contract.

9

¶24.    Further, the Agreement to Show Unlisted Property makes no reference to the Purchase and Sale Agreement, and vice versa.  As previously stated, the Agreement to Show Unlisted Property is unambiguous and required the Weirs to pay Maness's commission no matter the Weirs' reason for defaulting on the Purchase and Sales Agreement.

### 3.  Maness's Affidavit

¶25.    The Weirs argue that the county and circuit improperly considered Maness's affidavit as evidence for summary judgment because it was "self-serving and conclusory." *See Dalton v. Cellular S. Inc.*, 20 So. 3d 1227, 1233-34 (¶14) (Miss. 2009) (finding that "a conclusory, self-serving affidavit, unsupported by material facts relevant to the proposition at issue, is insufficient as a basis to grant summary judgment").  In its bench opinion, the county court addressed Maness's affidavit "[f]or an insight to the real estate industry" on appraisal contingencies:

> Based upon my 15 years of experience and training, it is widely-accepted within the real-estate industry that the appraisal contingency within a real-estate sales agreement is placed there for the protection of the purchaser and the mortgage company, and cannot be used by a seller as a means to nullify the agreement.

¶26.    Both the county court and circuit court granted summary judgment in favor of Crye-Leike based on the unambiguous terms of the Agreement to Show Unlisted Property (which detailed the terms of Maness's commission).  As stated by the county court:

> The Contract under consideration by the Court [(the Agreement to Show Unlisted Property)] – clearly provides it is an agreement to pay [Crye-Leike] to bring a Buyer to the Sellers – which it did.  Further, and explicitly, [Crye-Leike] was then to be paid a fee for its services.  **Period**.  Even "[S]hould the

10

seller default in any purchase and sale or transfer agreement to [Purchaser], the commission shall remain due." The Seller and the Buyer did enter into the requisite Separate Contract (under which they remained bound – until the Weirs declared it "null and void.") When the sale had been negotiated and agreed to, [Crye-Leike] had done its job[;] it had met its obligation under [t]he Contract and it was entitled to be paid.

¶27. Maness's affidavit strictly pertained to the terms of the Purchase and Sale Agreement and did not serve as the basis for the court's grant of summary judgment. The Weirs' argument fails.

¶28. In summary, we conclude circuit court properly affirmed the county court's grant of summary judgment in favor of Crye-Leike based on their de novo consideration and recognition of the clear, unambiguous terms of the Agreement to Show Unlisted Property. We likewise find the contract clear and unambiguous and affirm the holdings of the trial courts.

¶29. **THE JUDGMENT OF THE DESOTO COUNTY CIRCUIT COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANTS.**

**LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, ISHEE, CARLTON, MAXWELL AND JAMES, JJ., CONCUR. WILSON, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**